**MISS JANEL, INC., a corporation, and U.S. Fire Insurance Company, a corporation, Plaintiffs,**

v.

**ELEVATING BOATS, INC., a corporation, et al., Defendants.**

**Civ. A. 84–1199–AH.**

United States District Court, S.D. Alabama, S.D.

Feb. 13, 1989.

Joe E. Basenberg and Alex F. Lankford, III, of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for plaintiffs, Miss Janel, Inc., a corp. and U.S. Fire Ins. Company, a corp.

George J. Dowd, Braithwaite, La., and W. Dewitt Reams and David M. O'Brien, of Reams, Vollmer, Philips, Killion, Brooks & Schell, Mobile, Ala., for defendants Elevating Boats, Inc., Mobil Oil Corp. and/or Mobil Oil Exploration and Producing Southeast, Inc., Grant Geophysical Corp. and M/V Logging Elevator.

## ORDER

HOWARD, Chief Judge.

The above-styled action was heard before this Court in a bench trial on April 2nd, 3rd and 4th, 1988. This Court has fully considered all pertinent materials in the file. For the following reasons, this Court concludes that the defendants are liable to the plaintiffs and, therefore, the plaintiffs are

entitled to recover such damages as set forth herein.

## FINDINGS OF FACT

1. There are two named plaintiffs in the present case. Miss Janel, Inc. was at all times hereto relevant the owner of a 72 foot wooden hull fishing vessel known as the MISS JANEL. Miss Janel, Inc. was an Alabama corporation which existed solely for the purpose of the ownership and operation of the F/V MISS JANEL. The principals of Miss Janel, Inc. were Fred Nelson and Edward Nelson. The other named plaintiff in this case is U.S. Fire Insurance Company, (hereinafter U.S. Fire), the hull underwriter for the F/V MISS JANEL. U.S. Fire was subrogated to a portion of the interest of the owner of the vessel by payment of certain insurance proceeds after the sinking of the F/V MISS JANEL.

2. The three named defendants in this case are Mobil Oil Company (hereinafter "Mobil"),[1] Grant Geophysical Corporation (hereinafter "Grant" or "Grant Geophysical"), and Elevating Boats, Inc. (hereinafter "Elevating Boats").

3. In October 1983, Mobil was involved in the exploration for oil and natural gas reserves in lower Mobile Bay. Mobil had engaged Grant Geophysical as an independent contractor to perform certain seismic studies in lower Mobile Bay and then to provide the data from the survey to Mobil. In connection with the seismic operations being performed by Grant Geophysical, Grant Geophysical contacted Elevating Boats, Inc. and chartered the jack-up barge M/V LOGGING ELEVATOR (hereinafter "LOGGING ELEVATOR"), from Elevating boats on a daily charter basis. The Grant Geophysical supervisor in charge of all operations in the Mobile Bay project was Robert Hogan. Directly under Mr. Hogan in the Grant Geophysical chain of command was Mr. Allen Boudreaux, the Grant Geophysical manager, who had the responsibility for the actual field supervision of Grant Geophysical operations on the Mobile Bay project.

4. The LOGGING ELEVATOR, a jack-up barge owned at all material times hereto by defendant Elevating Boats, was working in the lower end of Mobile Bay, Alabama, on October 16, 1983 (Testimony of William Schubert, Transcript p. 226; Deposition of Allen Boudreaux, February 18, 1988, p. 14 (hereinafter referred to as Boudreaux Deposition)).

5. The LOGGING ELEVATOR was a 43 foot long, self-propelled motor vessel. (Plaintiff's Exhibit 21; Testimony of Lynn B. Dean, Transcript p. 336–37). The LOGGING ELEVATOR was equipped with three legs, one at the port bow quarter, one at the starboard bow quarter, and one at aft midship, each leg was 58 feet long and 16 inches in diameter. (*Id.*) The legs were made of steel, and the bottom end of each leg was a pontoon, or foot having the dimensions of 8 feet in width and 17 feet in length. (*Id.*) The center line of the pontoon pad is 1½ feet in depth and tapers to approximately six inches at the opposite ends of the pad and gives it a cone shape on the bottom. (*Id.*) The pontoons were filled with foam to prevent their filling with water if pierced. (*Id.*)

6. The legs on the LOGGING ELEVATOR are raised and lowered by means of hydraulic motors and gears which mate with a gear rack welded on each leg. (Testimony of William Shubert, Transcript p. 218). The legs on the LOGGING ELEVATOR could be raised or lowered simultaneously or independently. (*Id.*) By the lowering of the legs, the pontoons could be implanted on the bottom of the barge. (*Id.*, p. 219). By continuing to operate the hydraulic mechanism which lowered the legs after the pontoons had hit the bottom, the barge could be raised above the surface of the water to form a stationary platform. (*Id.*)

7. On October 16, 1983, the LOGGING ELEVATOR was on charter to Grant Geophysical to be used as a platform from which Grant Geophysical could carry out seismographic operations in the bay. (Tes-

---

**1.** At the close of the trial on a revewed motion to dismiss, this Court granted the motion by the defendants to dismiss Mobil Oil Company.

timony of Allen Boudreaux, Transcript pp. 281–82). Grant had orally agreed to pay $400 to $450 a day to charter the vessel. (Deposition of Marvin Howard Acosta, December 17, 1985, p. 21, hereinafter referred to as the Acosta deposition; Transcript p. 330). Elevating Boats furnished the vessel and a captain. (*Id.*) The captain of the LOGGING ELEVATOR on October 16, 1983, was William Shubert. (Testimony of William Shubert, Transcript p. 217). The other crew members (those persons performing the actual drilling operations) were employees of Grant Geophysical (Boudreaux deposition, p. 12; Transcript p. 220). Grant Geophysical employees had complete control of the operations of the LOGGING ELEVATOR. (*Id.*)

8. Grant Geophysical, in turn, was working under contract with Mobil Oil Company conducting seismographic research. (Deposition Boudreaux, p. 11). Mobil had previously established certain drilling lines in Mobile Bay where the operations were to take place. (*Id.* p. 12). Grant Geophysical was responsible for setting off explosive charges at various points (called "shot points") along the drilling lines and recording the seismic data resulting from the explosions. (*Id.*) Grant Geophysical used a survey crew to locate the drilling lines and to locate each shot point along the drilling lines. (*Id.*) The survey crew found these locations by means of a Mini–Ranger Survey System, a radio navigation system set up by Grant Geophysical for this job. (*Id.* pp. 19–21). The shot points were set up at regular intervals of approximately 220 feet. (Testimony of Allen Boudreaux, Transcript p. 282).

9. The survey crew marked each shot point with a fluorescent-painted and numbered milk jug anchored by a piece of metal. (Testimony of Allen Boudreaux, Transcript p. 282). Although these markers usually stayed in place, they were frequently lost and had to be replaced. (Deposition Boudreaux, p. 62). In addition to getting lost, strong currents and traffic from navigation caused the markers to move. (*Id.*) If lost or moved, the markers could only be replaced accurately by the survey crew, using the mini-Ranger Survey System. (*Id.*)

10. After the survey crew had laid out the shot point markers, the normal procedure was for a drilling crew aboard the LOGGING ELEVATOR to move to each such shot point, jack up the barge to stay in position, drill a hole, and insert into the hole an explosive charge. (*Id.*, p. 12). A recording crew would later detonate the charge and record the data produced by the explosion. (*Id.*)

11. On the evening of October 15, 1983, after the drilling operations had been completed for that day, Captain Shubert moved the LOGGING ELEVATOR to the next shot point (# 312) along drilling line UGR–1 and jacked up the barge to stay in position for the next morning's work. (Testimony of William Shubert, Transcript p. 223). Although the exact location of drilling line UGR–1 (and, consequently, shot point # 312) was not established at trial, it was established that such line ran basically west to east some distance north of the Fort Morgan peninsula. (*Id.*, p. 222). Both the captain of the LOGGING ELEVATOR and the Grant Geophysical field supervisor knew that Line UGR–1 traversed an area frequently used by commercial fishing vessels. (Deposition Boudreaux, Transcript p. 45). Captain Shubert stayed on board the LOGGING ELEVATOR on the night of October 15, 1983, as was customary during the Mobile Bay project. (Deposition Boudreaux, p. 42).

12. The drilling operations commenced again on the LOGGING ELEVATOR at approximately 0800 hours on the morning of October 16, 1983. (Testimony of William Shubert, Transcript p. 223). The Grant Geophysical crew drilled a hole at shot point # 312 approximately 100 feet below the bay bottom and then placed a dynamite charge into the newly drilled hole. (Deposition Boudreaux, p. 15). Attached to the dynamite charge were cap wires which were then attached to the shot point marker and the marker was then placed back in the water. (Shubert Transcript, p. 232). The marker had been taken from the water during the drilling operations and was replaced after the completion of the operations. (*Id.*, p. 229).

13. It is unclear whether the charge was actually detonated at shot point # 312. However, it is clear that when the LOGGING ELEVATOR attempted to move from shot point # 312 on the morning of October 16, the Captain discovered that the starboard leg of the vessel was stuck in the mud. (Schubert Transcript, p. 223). The port and stern legs came up smoothly, but the starboard leg was stuck and would not move. (*Id.*) In an effort to free the leg the Captain began backing up and lifting the leg (*Id.*, p. 233). Captain Schubert testified that the seas were rough on that day. He also testified that as he was backing up attempting to free the leg, a wave struck the vessel and all the weight shifted to the starboard side of the vessel. (*Id.*) (*See also* p. 223). Captain Schubert heard a loud noise and felt the vessel bounce. (*Id.*) At this point, he put the vessel's engine in neutral. (*Id.*) He continued to lift the legs until he noticed that the starboard leg was broken. (*Id.*)

14. The Captain testified that the vessel had moved back about one-hundred feet when he noticed that the leg was broken. (*Id.*) After the Captain noticed that the starboard leg was broken, he put the port and the stern legs down on the bottom to hold them in that particular position. (*Id.*, p. 223). All three legs had been brought up, but only two legs were put back down. (*Id.*, p. 225). The particular location at which the Captain put down the two legs was approximately 100 feet away from shot point marker # 312. (*Id.*, p. 233). In his testimony, Captain Schubert stated that he never pulled back up to shot marker # 312. The reasonable conclusion to be drawn from this testimony is that the missing portion of the leg could have been lost anywhere between shot point # 312 and the new location.

15. When Mr. Boudreaux arrived the next day, the LOGGING ELEVATOR had already moved from shot point marker # 312 to this new location. (Deposition, p. 23). Mr. Boudreaux testified that Captain Schubert had already discovered that part of the leg was missing by the time he got there. (*Id.*)

16. Mr. Boudreaux further testified that as far as he knew the boat had moved

from shot point # 312 to the new location. Mr. Boudreaux testified that Captain Schubert realized that a portion of the leg was missing when the Captain attempted to lower the legs at the new location. (Boudreaux Deposition, p. 23).

17. When Mr. Boudreaux first discovered that part of the leg was missing, he radioed Grant's shore office and spoke to Mr. Robert J. Hogan, the Grant Geophysical supervisor, and reported the loss of the starboard leg. (Boudreaux deposition, p. 51). Boudreaux then waited aboard the LOGGING ELEVATOR for a diver who had been hired by Grant to conduct a search for the missing leg. When the diver, Mr. Shirah, first arrived at the LOGGING ELEVATOR, the sea was too rough and the current was too strong to attempt a search. (Boudreaux Deposition, p. 51). They decided to wait for the weather and the water to calm down before they attempted a search (*Id.*, p. 52). At approximately this time (the morning of October 17), the LOGGING ELEVATOR left Mobile Bay to begin its return trip to the Elevating Boat's repair shop to have the starboard leg repaired. (Schubert testimony, p. 226).

18. Prior to trial and prior to his being deposed, Mr. Shirah died. (Boudreaux Transcript, p. 285). As a result, information regarding the exact manner in which Mr. Shirah conducted his search for the lost leg was unavailable. (*Id.*) In view of Mr. Shirah's unavailability, the Court allowed Allen Boudreaux to testify over plaintiffs' objection as to the statements made by Mr. Shirah to Mr. Boudreaux after each segment of the search was conducted. (*Id.*) The search lasted approximately three hours. (*Id.*, p. 284). Mr. Shirah made several dives that afternoon and reported his findings to Mr. Boudreaux who remained in the dive boat anchored at shot point # 312. (*Id.*)

19. In the afternoon, after the weather had cleared, Boudreaux and the diver, Gary Shirah, went back into the bay and located the milk jug marker which purportedly designated shot point # 312. (Boudreaux Deposition, p. 52). Boudreaux testified that

the diver searched an area with a radius of approximately 200 feet in and around shot point # 312. (Boudreaux Deposition, p. 291). However, underwater visibility was extremely poor. (*Id.*) Mr. Boudreaux testified that Mr. Shirah disappeared from his sight as soon as he went overboard. (*Id.*) Mr. Boudreaux claimed that he could see air bubbles from Mr. Shirah's tanks while Mr. Shirah was conducting his search and that based on his watching the various locations from where the bubbles were occurring, that Mr. Shirah conducted a search of the area. (*Id.*) Mr. Boudreaux testified that Mr. Shirah reported that the bottom of the bay at that location was soft mud. (*Id.*) Mr. Shirah found three deep impressions, or holes in the mud, which appeared to have been left by the pontoons on the jack-up leg from the LOGGING ELEVATOR. (Boudreaux Deposition, p. 54). Mr. Shirah told Mr. Boudreaux that one of the holes was so deep that he was able to put his body most of the way in, yet he could still not find anything. (Boudreaux Transcript, p. 305). Based on the findings of his search, Mr. Shirah concluded that the missing portion of the starboard jack-up leg had sunk below the mud line and posed no threat to navigation. (Boudreaux Deposition, p. 27). Mr. Boudreaux concurred with Mr. Shirah's conclusion. (*Id.*) In fact, defendants only knew that the leg had been lost at an undetermined location and that it was not found during the brief search.

20. It is not absolutely certain that Mr. Shirah was searching at the exact location of shot point # 312. Mr. Shirah used the marker at shot point # 312 as a reference point. (Boudreaux Deposition, p. 52). As stated above, the markers were frequently lost or removed. (*Id.*, p. 62). However, the fact that the diver was able to find the three holes made by the pontoons lends credibility to the defendants' claim that the shot point markers had not moved, and that, therefore, the defendants were searching at or near shot point # 312. However, even if this Court were to find that the defendants searched for the leg at or near shot point # 312, it is not known with certainty that the leg was lost there. The leg might have been lost at shot point # 312, the new location, or at some point in between. The current was very strong and the leg which broke at one location could have been carried by the current to another location.

21. No other search was ever conducted by any of the defendants in this case. (Boudreaux Transcript, p. 306). Elevating Boats, the owner of the LOGGING ELEVATOR, had nothing to do with the search that did take place. (*Id.*) The diver who searched for the leg for Grant was employed by Grant and Mobil. This search was not done at the direction or the instruction of Elevating Boats (although Elevating Boats knew of the search). (*Id.*)

22. Robert Hogan (supervisor for Grant), called Elevating Boats both before and after the search to inform them of the situation. (*Id.*, p. 26). He notified Marvin Acosta, the General Manager for Elevating Boats, that the leg had been lost, and he also informed him of Grant's search efforts. (*Id.*) (Testimony of Robert Hogan).

23. The testimony clearly established that Grant was not acting on behalf of Elevating Boats, but that it was acting on its own behalf. (Acosta Deposition, p. 35; Hogan Deposition, p. 26). Grant was not an agent of Elevating Boats. Elevating Boats never requested that Grant search for the leg. Elevating Boats neither searched for the leg itself nor instructed anyone to search on its behalf. ELEVATING BOATS was aware that Grant was conducting a search because Grant had informed Marvin Acosta (employee of Elevating Boats) of the loss and of the search. (Acosta Deposition, pp. 31 and 32).

24. The Coast Guard authorities were notified and given the specifics about the location of the leg on the same afternoon that the diver made his search. (Hogan Deposition, p. 27). Robert Hogan also informed the Coast Guard that there was a diver on the scene who was searching for the lost leg. (*Id.* pp. 27 and 28).

25. Grant, Mobil, and Elevating Boats made no further efforts to locate the whereabouts of or to retrieve the leg after October 16, 1983. (Boudreaux Transcript, p. 306).

26. On October 23, 1983, the fishing vessel MISS JANEL, a 72 foot wooden hull shrimping boat owned by plaintiff MISS JANEL, Inc. was proceeding from her anchorage through the bay to go into the Gulf of Mexico to begin shrimping. (Frank Nelson Transcript, p. 14). Edward Nelson, 50% owner of MISS JANEL, Inc., was the captain of the vessel on that day. (Edward Nelson Transcript, p. 51). He testified that shortly after he rounded an oil rig in the bay, proceeding along the usual route of shrimping vessels in the area, he struck an object about ¼ mile west-southwest of the oil rig and a short distance north of the Fort Morgan peninsula. (*Id.*, pp. 53 and 55). Mr. Nelson did not see the object that the MISS JANEL struck, either prior to, or after the striking. (*Id.*) The MISS JANEL immediately began to take on water, and upon realizing that the boat was going to sink, Captain Nelson turned the boat due south and ran for a distance described as a one hundred fifty or so yards toward the beach of Fort Morgan Peninsula. (*Id.*, p. 54). The vessel was on the bottom within a matter of minutes, with only a portion of her rigging initially remaining out of the water. (Frank Nelson Transcript, p. 19). The crew was rescued by a passing fishing boat. (*Id.*, p. 55). There were no personal injuries resulting from the sinking of the MISS JANEL. (*Id.*) (Testimony of Frank Nelson).

27. The MISS JANEL struck the object which sank her in the same area where the LOGGING ELEVATOR had been conducting drilling operations on October 16, 1983. (Frank Nelson Transcript, pp. 21 and 22).

28. The owners of MISS JANEL, Inc., (Edward Nelson and his father, Fred H. Nelson), immediately notified the Coast Guard of the MISS JANEL's sinking, and they also notified the local insurance agent representing U.S. Fire. (Fred Nelson Transcript, p. 19). Frank Nelson located the sunken hull and marked that portion of its rigging still above water with lights. (*Id.*) (Testimony of Fred H. Nelson).

29. Mr. Ronald Sutton, a marine surveyor located in Bayou La Batre, Alabama, was hired by U.S. Fire to conduct the investigation into the sinking of the MISS JANEL. (Ron Sutton Transcript, p. 90).

30. Mr. Sutton, in turn, contacted Mr. Lee Statler, President of Offshore, Inc., and asked him what he would charge to salvage the vessel. (Ron Sutton Transcript, p. 91). Statler agreed to attempt to salvage the MISS JANEL for $15,000 on a "no cure—no pay" basis. (*Id.*) Mr. Sutton had been required to engage surveyors for the salvage of sunken vessels on previous occasions and he considered the $15,000 bid for the survey to be fair and reasonable. (*Id.*)

31. Offshore's salvage barge first got to the site of the MISS JANEL's sinking on October 25, 1983, but the water was too rough to raise her at that time. (*Id.* p. 93). All of the MISS JANEL that could be seen at that time were the tops of her mast and outriggers. (*Id.*) Mr. Statler testified to observing and hearing the vessel pounding on the bottom of the bay. (Mr. Statler Transcript, p. 194). He also testified that the vessel was "hard over" on her rigging and that the wave action in the bay was rolling the vessel around. (*Id.*) The salvage barge stood by on October 26, 1983, because the water was still too rough to begin salvage operations. (*Id.*) On October 27, 1983, the salvage operations began. (*Id.*)

32. Mr. Statler's first course of action was to send a diver down to observe and survey the condition of the vessel. (*Id.*) Mr. Statler received a report that the vessel had sustained severe damage to her stern and that she was beginning to break apart on her port side. (*Id.*) The salvors first secured a strap around the bow of the vessel and attempted to roll her to an upright position. (*Id.*) They were partially successful, and after getting the vessel into a semi-upright position, they attempted to attach a strap around the stern of the vessel. (*Id.*) Initially, they could not get a strap around the stern, but eventually, the salvors were able to secure this strap. (*Id.*)

33. With the straps in place, Mr. Statler then attempted to raise the vessel from the bottom. (*Id.*) When the vessel was partly out of the water, the stern strap broke, and the vessel had to be lowered once again.

(*Id.*, p. 195). Mr. Statler went back to the salvage yard to get another nylon strap that he had at his office and came back the next day. (*Id.*) In the meantime, the weather conditions turned sour once again, and the vessel could not be raised until November 2, 1983. (*Id.*)

34. Mr. Statler did not use a spreader bar, doublers, or strong backs. (*Id.*) Some damage was caused to the vessel's hull during the raising of the vessel, particularly on the port after quarter. (*Id.*, p. 197). Mr. Statler testified that he could not use a spreader bar in salvaging the MISS JANEL because he felt at the time that they needed to start the salvage operation because if the boat stayed down there much longer, "it was going to beat itself to death." (*Id.*, p. 195). Mr. Statler testified that the MISS JANEL's rigging was bent before the salvage operations began as a result of the boat's rolling on the bottom. (*Id.*, p. 198). The after deck had been torn free by the water and the bowstem and forward bulwarks had been damaged. He also testified that because of the pounding and the adverse weather conditions to which the MISS JANEL had been subjected while on the bottom of the bay, the integrity of the vessel had been substantially compromised. This being the case, he did not feel confident in lifting the vessel completely out of the water. (*Id.*, p. 197).

35. After Offshore partially raised the vessel, the MISS JANEL was brought to Offshore's yard on Pinto Island near Mobile still suspended in the slings of the salvage barge and still partially submerged. (Statler Transcript, p. 197).

Mr. Statler, with the approval of Ronald Sutton, cut off the mast of MISS JANEL with a torch and removed all of the vessel's fishing gear, tackle, outriggers, and mast. (Statler Transcript, p. 197).

36. Both Sutton and Statler were suspicious that the MISS JANEL may have struck the leg from the LOGGING ELEVATOR because each had heard of the loss of the leg over the radio. (*Id.*, p. 201). Mr. Sutton needed to determine the cause of the MISS JANEL's sinking as part of his investigation. (Sutton Transcript, p. 96).

Mr. Sutton hired Ken Meyers, an oceanographer from New Orleans specializing in locating underwater objects, to come to Mobile Bay to make a search for an object that the MISS JANEL may have struck. (Ken Meyers Transcript, p. 166). Mr. Meyers was the president and owner of Sea Borne Electronics Search and Survey. (*Id.*, p. 165). Mr. Sutton told Meyers to begin his search in an area due north of the site of the sunken MISS JANEL. (*Id.*, p. 166). To conduct his search, Mr. Meyers used a device known as a magnetometer, which detects disturbances in the earth's magnetic field caused by metal objects and, thereby, locates the objects. (*Id.*, p. 167).

37. On October 29, 1983, Mr. Meyers began his search a short distance due north of the MISS JANEL. (*Id.*, p. 166). He conducted the search by dropping a buoy in the center of the area where they suspected the object might be located and then laid out a grid. (*Id.*, p. 167). He then began making passes along the grid lines. (*Id.*) As he made these passes, the magnetometer detected the lines formed by the earth's magnetic field. (*Id.*) If those lines were disturbed, the reason was because a metal object was redirecting the flow of the magnetic lines. (*Id.*) By pinpointing the location of the disturbance, Mr. Meyers could locate the underwater metal object. (*Id.*)

38. Mr. Meyers located an underwater metal object, which turned out to be a portion of a jack-up leg and its pontoon, in no less than 15, nor more than 30 minutes of commencing his search (*Id.*) Mr. Meyers continued to search in that general vicinity for six to eight more hours to be sure that no other metal objects were in the area. (*Id.*, p. 168). The area of his search was an area approximately one mile in length going from east to west and three quarters of a mile in width going from north to south. The search established a grid of search lines in the area 300 feet apart. (*Id.*, p. 168). Mr. Meyers found no other metal objects in that area. (*Id.*, p. 100). It is undisputed that the leg salvaged by Mr. Statler was the broken jack-up leg from the LOGGING ELEVATOR.

39. Offshore began salvaging the leg at the request of Mr. Sutton, representing the

insurer of the MISS JANEL. (Sutton Transcript, p. 98). Mr. Statler contracted to raise the leg for $12,000 on a no cure— no pay basis. (*Id.*)

40. Elevating Boats learned that a jack-up leg had been found in the lower portion of Mobile Bay where the LOGGING ELEVATOR had been working. (Lynn Dean Deposition, p. 10). Elevating Boats also learned that Offshore intended to salvage the leg. (*Id.*) Lynn Dean, President of Elevating Boats, objected to Offshore's salvage operation and sent a salvage barge of his own to Mobile Bay to retrieve the leg that Mr. Meyers had found. (Lynn Dean Testimony, pp. 338 and 366). The plaintiffs assert that ELEVATING BOATS had abandoned the leg. Elevating Boats contends it was not abandoned, but lost during sea operations. (Testimony of Douglas Dean and Marvin Acosta).

41. Douglas Dean, Lynn Dean's son and an employee of Elevating Boats, went to Dauphin Island, just outside of Mobile Bay, to await the arrival of the salvage barge sent by Elevating Boats. (Douglas Dean Deposition, pp. 22–24). Douglas Dean was going to oversee the salvage of the leg found by Mr. Meyers and, as he put it, "bring it back home". (*Id.*, p. 21). Such salvage barge went first to the site of the leg before going to Dauphin Island. (*Id.*, p. 22). When such barge arrived on the scene, Offshore was already in the process of raising the leg. (*Id.*) The captain of the Elevating Boats barge was allowed to come aboard Offshore's barge to observe the salvaged leg. (Evans Deposition, p. 371). The Elevating Boats barge then went to Dauphin Island, and the captain informed Douglas Dean that Offshore had already retrieved the leg. (*Id.*, p. 372).

42. Lynn Dean, the President of ELEVATING BOATS, said that he instructed Statler not to raise the leg because he wanted to raise it himself. (Lynn Dean Transcript, pp. 338 and 339). After Statler went ahead with the salvage operation and took the leg back to his yard, Dean demanded the return of the leg at Statler's expense. (Lynn Dean Transcript, p. 3). Mr. Dean's deposition in this case was taken in December 1985. Plaintiffs read a portion of his deposition into evidence.

The following testimony set forth in Mr. Dean's deposition referred to the leg that Mr. Statler raised from Mobile Bay:

Q. Have you been advised that it [the leg] was available to you?

A. I have been told that about it and my reply to that has been that they owe me the freight and whatnot. I sent a boat over to pick it up. They didn't do it. If it is the one they picked up and belongs to me, they should ship it over here to me. When I tried to get it, they wouldn't let me have it. I consider it stolen. Mr. Statler was foreign. His attorneys were foreign. Leave it alone. They went out and picked up something and then said this is yours. They wouldn't let me see it. So, I don't know what it is.

(Lynn Dean Deposition, p. 36).

43. Elevating Boats has admitted that the leg which was raised by Statler was the leg lost from the LOGGING ELEVATOR. Elevating Boats has made a counterclaim for the value of the leg. (Answer and reconventional demand, Tab # 5). Furthermore, on May 10, 1985, plaintiffs tendered the leg which Mr. Statler had salvaged to Elevating Boats on the condition that Elevating Boats pay into the court the $15,000 claimed as the value of the property. (Tender of abandoned property, Tab # 20). In its response to this tender by the plaintiffs, Elevating Boats said, as follows:

Property was not abandoned but was lost during sea operations. Offshore, Inc. subsequently found the property and contrary to the expressed desires of Elevating Boats, Inc. took possession of the said property and refused to allow the owner possession or even inspection of the property. The arbitrary acts of Offshore, Inc. caused damages to Elevating Boats, Inc. that cannot be satisfied by return of the leg. (Opposition to tender of abandoned property, Tab # 23).

44. The leg from the LOGGING ELEVATOR was salvaged on November 4, 1983, and brought to Offshore's salvage yard near Mobile. (Sutton Transcript, p. 99). Immediately upon arrival of the leg at

Offshore's yard, it was the subject of a joint survey, attended by John Kern, a marine surveyor representing Mr. Lynn B. Dean, and Mr. Wesley Homes representing Mr. Dan Frazier, Jr., an attorney for ELEVATING BOATS, Inc. (*Id.*, p. 107). Mr. Sutton testified that wood fragments painted with red paint were imbedded in the upper end of the broken leg. (*Id.*, pp. 112 and 113). Mr. Sutton testified that the paint appeared to him to be marine anti-fouling paint of the same kind that was on the hull of the MISS JANEL. (*Id.*) These wood fragments were also observed by Mr. Kern, who took samples of them from the leg. (Kern Transcript, p. 406).

45. Mr. Sutton had the end of the salvaged leg containing the wood fragments cut off and taken to a local laboratory along with wood samples taken from the hull of the MISS JANEL. (Sutton Transcript, p. 112). (Plaintiff's Exhibit 17). At this laboratory, paint samples were taken from the wood fragments imbedded in the end of the pipe and also from the wood taken from the hull of the MISS JANEL. (*Id.*) A comparative analysis of the two paint samples revealed that they had identical metallic and semi-metallic elements, leading the analysts to conclude that the two paint samples were of the same or similar origin. (Baya Transcript, p. 240). Although there was testimony that this marine anti-fouling paint is commonly used on vessels, the fact that the two paint samples were of the same or similar origin is a factor which this Court has considered in determining whether the leg was the object which the MISS JANEL actually struck.

46. This Court finds that the leg found by Mr. Meyers and then salvaged by Offshore, Inc. on November 4, 1983, was the object which the MISS JANEL struck. This Court relies on the following facts in making such determination: The leg was located due north of the vessel, exactly where Frank Nelson said he hit the object, and there were wood fragments embedded in the leg with paint on them matching the MISS JANEL's paint. (Testimony of Frank Nelson and Emory Baya, *supra*). The Court also finds that this leg was the leg lost from the LOGGING ELEVATOR.

The leg was located in the same area where the LOGGING ELEVATOR was working on October 16, 1983. It was the only leg found in the vicinity, and it was the only leg known to be lost in the vicinity. (Ken Meyers Transcript, p. 168). Furthermore, Elevating Boats has admitted that the leg salvaged by Offshore belonged to the LOGGING ELEVATOR.

## DAMAGES SUSTAINED BY MISS JANEL, INC.

### VALUE OF THE MISS JANEL

47. The MISS JANEL, built in 1972, was a wooden hull, 72 foot shrimp boat built by Desco in St. Augustine, Florida. (Fred Nelson Transcript, p. 14). MISS JANEL, Inc., purchased the MISS JANEL in 1977. (*Id.*) At some point before the purchase, the MISS JANEL had been sunk and had sat up on a jetty for an indeterminate amount of time. (Nelson Transcript, p. 14). MISS JANEL, Inc. bought the MISS JANEL for $11,400. (*Id.*)

48. After the purchase, Fred H. Nelson, an owner of MISS JANEL, Inc. had the MISS JANEL towed from Miami to his place of business in Bon Secour, Alabama. (*Id.*) While in Bon Secour, he undertook an extensive rebuilding project which lasted approximately three months and cost between $80,000 and $90,000. (*Id.*, p. 16). The $80,000–$90,000 figure, however, does not reflect all of the labor that went into refurbishing the vessel because much of the labor was performed by family members at no cost to MISS JANEL, Inc. (*Id.*)

49. Jerry Finley, a marine surveyor, surveyed the vessel in 1977 and in 1979 to determine the value of the vessel for the purpose of obtaining insurance on the MISS JANEL. (Jerry Finley Transcript, p. 79). In 1977, the market value of the MISS JANEL was $126,700. (*Id.*, p. 81) (*see* Plaintiffs' Exhibit 12–A). In 1979, the market value was $128,000. (*Id.*, p. 80) (Plaintiffs' Exhibit 12).

50. From the time MISS JANEL, Inc. completed rebuilding the vessel in 1977 to the time that she sank in 1983, the Company maintained $105,000 insurance coverage

on the vessel. (Fred H. Nelson Transcript, p. 17). The United States Fire Insurance Company (U.S. Fire) provided the insurance for the MISS JANEL. (*Id.*, p. 18).

■ 51. At the time she sank, the MISS JANEL was insured for $105,000 with United States Fire Insurance Company (U.S. Fire). (*Id.*) The policy had been issued in June, 1983. (*Id.*) (*See also* Plaintiffs' Exhibit 1).

52. The policy included a $5,000 deductible. After the MISS JANEL sank, U.S. Fire paid to MISS JANEL, Inc. $100,000 and became subrogated to MISS JANEL, Inc.'s rights against the parties causing the vessel's sinking. (Sutton Transcript, p. 121) (Plaintiffs' Exhibit 1).

53. Each side in this litigation presented testimony from marine valuation experts on the pre-sinking value of the MISS JANEL. Plaintiffs produced the testimony of Jerry Finley, Ronald Sutton and James Nelson. Mr. Sutton and Mr. Nelson both inspected the vessel after she was brought to Lee Statler's salvage yard. (Testimony Sutton and Nelson, *supra*). James Nelson was the owner of Nelson's boat yard which performed the hull repairs to the MISS JANEL when she was first brought to Bon Secour in 1977. (Fred Nelson Transcript, p. 15). Defendants introduced the testimony of John Kern and Chris Collier, marine surveyors who had been hired by Elevating Boats to survey the MISS JANEL after she was salvaged.

54. The basis of the differences of opinion concerning the value of the vessel was that the experts disagreed on the extent and the effect of deterioration of the vessel's wooden structures. All wooden vessels are subject to deterioration. (James Nelson Transcript, p. 180). It is common in the shrimping industry to have a boat completely reframed and redecked after about 15 years of service. (Finley Transcript, p. 87). A vessel owner can tell when the vessel needs attention because there will be more leakage than usual, and there will be soft spots on the deck of the boat. (Frank Nelson Transcript, p. 59). The owners and operators of the MISS JANEL had detected none of these signs of deterioration before the sinking. (*Id.*) The deterioration that

was present on the MISS JANEL could be seen only because the damage the vessel sustained while on the bottom had exposed some of the internal structures not otherwise visible. (Finley Transcript, p. 86) (Sutton Transcript, p. 118) (Testimony of James Nelson, Frank Nelson, and Fred H. Nelson).

55. Plaintiffs called as their value experts Ronald Sutton, Fred Nelson and James Nelson. Sutton has owned shrimp boats, crewed on shrimp boats, managed shrimp boats, and has performed engine and hull repairs on shrimp boats. (Sutton Transcript, pp. 89 and 90). He has been a marine surveyor since the early 1970's. (*Id.*) For the fifteen years prior to his testimony he had been an independent marine surveyor, adjusting hull and machinery claims and performing condition and valuation surveys for insurance companies. (*Id.*)

56. Mr. Sutton testified that the market for shrimp boats in 1983 was high, and that he estimated the pre-sinking market value of the MISS JANEL to be $130,000–$140,000 less the amount to repair the deteriorated wooden structures that became visible after the sinking. (Sutton Transcript, p. 127) (*See also* p. 118). (Testimony of Ronald Sutton).

57. James Nelson, who not only repairs wooden hull shrimp boats, but also buys and sells them, testified that the pre-sinking value of the MISS JANEL was $120,000–$130,000. (Nelson Transcript, p. 185). He thoroughly inspected the vessel after the sinking hoping he would get the job to salvage her (raise her), or to do any repair work required and if there was no work required, then to bid on the salvaged hull. (*Id.*, p. 177). Nelson testified that the deterioration he saw on the vessel would not have significantly affected the market value of the vessel for several reasons. (*Id.*, p. 185). First, none of the deterioration was detected by the owner, nor was it detectable before the vessel sank. (*Id.*, pp. 185 and 186). More importantly, James Nelson said that the deterioration that he saw would not have needed repair for three years or more. (*Id.*, p. 185). He testified

that the vessel was "shrimpable" for three or four more years before it would have needed repair. (*Id.*) Finally, the deterioration he saw did not extend throughout the vessel, but it was concentrated in the icehold area, where wooden shrimp boats are most susceptible to deterioration. (*Id.,* p. 182). The internal structures in areas other than the icehold were in good shape. (*Id.*)

58. James Nelson also testified that to completely reframe and redeck the MISS JANEL in 1983 would have cost approximately $35,000–$40,000. (*Id.,* p. 181). To adequately repair the deterioration that was present in the vessel would have cost $30,000; $20,000 to do the deck and $10,000 to repair the ice hold area where deterioration was present. However, the $10,000 to repair the ice hold area would not have been a necessary expense for three or four more years. (*Id.,* p. 183).

59. Fred Nelson, owner, testified that in his opinion the vessel, before her sinking, had a market value of $110,000. (Fred H. Nelson Transcript, p. 27).

60. John Kern gave the MISS JANEL a pre-sinking value of only $35,000–$50,000. (Kern Transcript, p. 395). At the time he made his survey of the MISS JANEL, Kern had surveyed only three wooden vessels, which ranged in size from 45 feet to 65 feet. (*Id.,* p. 393). He inspected the MISS JANEL from the deck of the ranger one on November 8th. (*Id.* p. 377). At this time he observed extensive damage on most of the bulwarks and that the hull had been carried away or destroyed by some fashion. (*Id.,* p. 378). He also noticed that a good number of the frames were rotted and that the deck had extensive rotting. (*Id.*) However, when Mr. Kern made these observations, he was not on the MISS JANEL but was merely observing from the deck of another boat. (*Id.*) From the RANGER ONE, Mr. Kern was unable to observe all of the equipment. (*Id.*) He did see a winch which he described as badly rusted and he could see that the mast had been cut off. (*Id.,* p. 379). Mr. Kern testified that he was not able to examine certain areas of the machinery space because of the hazard of moving around in the muddy structures. (*Id.,* p. 389). For the same reason, he was unable to examine the electronic equipment in the deck house. (*Id.,* p. 390).

61. Mr. Kern also said that he relied primarily on national publications advertising boats for sale to establish what the market for shrimp boats was at the time. (*Id.,* p. 393). However, it should be noted that the market for shrimp boats varies with location. Other than Mr. Collier, Mr. Kern did not speak to anyone locally concerning the value of the boat. Accordingly, his opinion is entitled to little weight.

62. Defendants also placed Chris Collier on the stand. Mr. Collier is a marine surveyor who was hired by Elevating Boats to survey the MISS JANEL after her sinking. (Collier Transcript, p. 408). Mr. Collier's testimony on the witness stand was significantly inconsistent with prior statements made about the value of the MISS JANEL. Collier testified that when he surveyed the MISS JANEL he made a thorough survey of the entire outer structure of the vessel by going around it in a skiff. (*Id.,* p. 410). He then climbed aboard the vessel and went through it as best as he could. However, due to partial flooding, conditions were dangerous and he was unable to view parts of the vessel. At that time, he reported no bleeding on the vessel. (*Id.,* p. 425). ("Bleeding" is a condition which evidences poor structural integrity of the hulls of wooden vessels.) (*Id.,* p. 422). In a deposition, Collier had said that if there was no bleeding indicated on his survey report, then there was no bleeding on the vessel. (*Id.,* p. 425). At trial, Collier reviewed his survey report and admitted that it included no indications of bleeding on the vessel. (*Id.*) Nevertheless, at trial he testified to extensive bleeding on the vessel. (*Id.,* p. 422). When confronted with his earlier inconsistent statement, he stated that he could see the bleeding now from the photographs shown to him. (*Id.,* p. 426). In other words, after a close-up visual inspection of the MISS JANEL in 1983, he saw no bleeding, but looking at pictures approximately five years later he testified to extensive bleeding.

63. Further undermining Collier's credibility is the fact that at trial he gave the MISS JANEL a salvage value of $20,000–$25,000. (*Id.,* p. 421). In 1983, however, immediately after viewing the vessel, he gave the MISS JANEL a salvage value of only $10,000. (*Id.,* p. 427). He could not explain the inconsistency in his testimony.

64. Mr. Kern and Mr. Collier also contradicted each other's testimony. Kern testified that 50–60% of the decking on the MISS JANEL was deteriorated or rotten. (Kern Transcript, p. 396). Collier, on the other hand, testified that 70–90% of the decking was deteriorated. (Collier Transcript, p. 411). The Court finds that the expert opinions presented by the defendants' experts are entitled to little weight on the issue of the MISS JANEL's pre-sinking value.

65. All experts agreed that a 1972, wooden hull, 72 foot Desco shrimp boat in top shape would have had a market value of $150,000 in 1983. (Testimony of Ronnie Sutton, James Nelson, John Kern and Chris Collier). The MISS JANEL had a pre-sinking market value of $115,000 less $40,000 (the amount to repair the deteriorated wooden structures) for a total of $75,000.00. This Court finds that the MISS JANEL had a pre-sinking value of $75,000.00.

66. All parties agree that the MISS JANEL was a constructive total loss. (Transcript p. 114). Undisputed evidence establishes that the cost to repair the MISS JANEL would have exceeded $200,000. (Plaintiffs' Exhibit G). (*Id.*)

## MISCELLANEOUS DAMAGES

67. Aboard the MISS JANEL when she went down were stores to sustain a crew of three men for a ten-fourteen day trip. The groceries and other supplies aboard cost MISS JANEL, Inc. about $350.00. Also on board were 90 blocks of ice, costing about $350.00. (Nelson Transcript, p. 32). After the vessel went down, MISS JANEL, Inc. paid the two deckhands $300 apiece for their lost personal items. (*Id.*) Additionally, U.S. Fire incurred expenses for its surveyor, Mr. Sutton, in the amount of $1,575 and expenses in salvaging the hull of the MISS JANEL in the amount of $15,000.00. (Plaintiffs' Exhibits 10 and 7).

## CONCLUSIONS OF LAW

1. This action comes before this Court pursuant to its admiralty jurisdiction under 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

## LIABILITY OF ELEVATING BOATS

2. At trial, the defendants stipulated that their responsibilities with regard to the loss of the leg of the LOGGING ELEVATOR were governed by The Rivers and Harbors Act of 1899, as amended, 33 U.S.C. § 409, (the Wreck Act), which imposes upon the owner of a vessel the non-delegable duty to find and mark any obstruction or hazard to navigation created by the vessel's sinking. *See also Inland Tugs Co. v. Ohio River Co.,* 709 F.2d 1065, 1071 (6th Cir.1983) (hereinafter referred to as *Inland Tugs* ). Under § 409, the duty to find a submerged wreck or hazard carries with it an implied duty to search for the submerged object if its whereabouts are unknown. *Allied Chem Corp. v. Hess Tankship Co.,* 661 F.2d 1044 (5th Cir.1981). The vessel's owner is charged with marking the obstruction or hazard to navigation and the owner also has a continuing duty to insure or maintain that mark until the obstruction is removed or until its abandonment is legally accomplished. (*Inland Tugs, supra* ). The duties to mark and maintain the mark are non-delegable, non-imputable duties which cannot be assigned to or assumed (to the absolution of the owner from liability) by any third party including the United States. (*Id.*)

3. The defendants argue that they fulfilled their obligations under 33 U.S.C. § 409 when they conducted a good faith search for the leg and were unable to find it. For this proposition they cite *Nunley v. M/V DAUNTLESS COLOCOTRON-IS,* 727 F.2d 455 (5th Cir.1984) and *Allied Chem. Corp. v. Hess Tankship Co.,* 661 F.2d 1044 (5th Cir.1981). These cases clearly indicate that if the owner of the vessel makes a good faith search for the wreck and is unable to find such wreck, the

owner will be relieved of any liability caused by the wreck or sunken object. (*Id.*) In *Allied Chemical Corp.*, the Fifth Circuit stated, "However strong the requirement that the owner of a sunken vessel must mark and remove it, a requirement that we have no wish to weaken, it simply cannot apply when the owner has made a full, good faith search for his craft and cannot find it." (*Id.*, 661 F.2d at 1061. *Accord, Nunley*, 696 F.2d at 1144 (quoting *Allied Chemical Corp.*). At no time, however, did the owner of the vessel, Elevating Boats, make any effort to locate the submerged leg. Though Elevating Boats was given notice of the loss of the leg immediately by Grant, Elevating Boats chose to rely on the search conducted by Grant rather than fulfill its obligations. The law does not afford a vessel owner such a privilege. *Inland Tugs, supra,* at 1069–70.

■ 4. In the *Inland Tugs* action, the owner of a barge that had sunk in the Ohio River requested that the Coast Guard buoy the barge. *Inland Tugs, supra.* The Coast Guard did so, but approximately two months later the buoy was removed. (*Id.*) The barge owner informed the Coast Guard that the buoy had been removed and asked that the wreck be remarked. (*Id.*) The owner relied upon the Coast Guard's assurances that the barge would be re-buoyed, but the Coast Guard never marked the wreck again. (*Id.*) When a tug struck the unmarked wreck and sank, the owner asserted that his reliance on the Coast Guard's marking the vessel relieved him of liability. (*Id.*) The court rejected the claim holding that the owner could not rely on another to perform its obligations under the Wreck Act. (*Id.*)

> While authorizing the owner to seek assistance from any source including the Coast Guard, Congress has concurrently manifested an intent that such assistance, if received, fails to vitiate any of the owner's Wreck Act responsibilities.

(*Id.* at 1070). A vessel owner may use an agent to search for and mark a wreck or hazard, but the owner remains ultimately responsible. (*Id.* at 1069). In the present case, however, the *only* search that was conducted was that of Grant. Elevating Boats knew that Grant was conducting a

search, but such knowledge did not relieve ELEVATING BOATS from its own responsibilities with respect to the LOGGING ELEVATOR's lost leg. The duty to search was non-delegable, and Elevating Boats had no right to rely on Grant's search. Accordingly, the Court finds that Elevating Boats breached its duty under the Wreck Act (33 U.S.C. § 409) to search for, mark, and maintain the mark on Elevating Boats' sunken jack-up leg.

### LIABILITY OF GRANT

5. The basis of Grant's liability is that it voluntarily undertook to perform a duty owed by another party, knowing the other party was relying on them, and then performed that duty negligently. The duty to search for and mark the submerged jack-up leg belonged to Elevating Boats. (33 U.S.C. § 409). Grant voluntarily assumed that duty by conducting its own search. Grant also informed Elevating Boats that the search was being conducted, inducing reliance by Elevating Boats on Grant's search.

■ 6. A person who voluntarily assumes a duty owed by another and then breaches that duty becomes liable to one who is injured as a result of the breach. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (hereinafter referred to as *Indian Towing*). The "good samaritan" rule is applicable in maritime cases, and is set forth in section 324A of the Second Restatement of Torts:

> One who undertakes gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A *quoted in Patentas v. United States*, 687 F.2d 707, 715 (3rd Cir.1982).

7. In the *Indian Towing* action, a tug boat ran aground because a lighthouse operated by the Coast Guard was not functioning. The Supreme Court said:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleus Island and engendered reliance on the guidance afforded by the light, the Coast Guard was obligated to use due care to make certain the light was kept in good working order. . . .

*Indian Towing, supra.*

 8. This Court holds that the good samaritan doctrine of § 324A applies in this case. This Court finds that the defendant Grant Geophysical assumed and undertook the duty of Elevating Boats (as owner of the lost jack-up leg) to search for and mark the lost jack-up leg. Defendant Grant Geophysical assumed and undertook this duty and is, therefore, under the good samaritan doctrine liable to third parties (in this case, the plaintiffs) for the physical harm resulting from Grant's failure to exercise reasonable care to protect its undertaking. The Court finds that Grant breached its duty by failing to conduct a reasonable, good faith search for the lost jack-up leg. (RST 2d TORTS § 324(b)). The Court also finds that the harm (the sinking of the MISS JANEL) was suffered because of reliance by Elevating Boats upon the undertaking of the duty by Grant to search for the object. (RST 2d TORTS § 324(c)). Elevating Boats' president, Lynn Dean, testified that he understood that Grant Geophysical and Mobil were conducting the search. Mr. Dean knew that Elevating Boats had a statutory duty to search for the lost leg, and he knew Grant was conducting a search, and that he chose to refrain from conducting a search in reliance upon Grant's undertaking of that responsibility. Clearly, Elevating Boats relied to its detriment on Grant's undertaking of the duty to search.

 9. When Grant assumed Elevating Boats' duty to search for the leg, Elevating Boats, unjustifiably relied on Grant to perform that duty with due care. Grant's failure to exercise due care in conducting a search for the leg renders it liable to the plaintiffs for the damages proximately caused by the breach of the duty. *The search that did take place was inadequate under the circumstances and cannot reasonably be said to have been a full, good faith search fulfilling defendants' obligations under § 409.* The Court finds that:

(1) The defendant Grant Geophysical did not know the exact location where the jack-up leg was lost. (2) All that Grant knew was that the leg was lost at or between shot point #312; and the location that Captain Schubert backed up to. (3) The distance between these two points was approximately 100 feet. (4) The current was very strong at the time of and in the area where the search was conducted. (5) The water in this area was very muddy (Allen Beaudreax testified that he could not see the diver after he dove into the water). (6) The weather in this area was rough on the day Grant's diver made his search for the leg. (7) The diver employed by Grant searched an area with an approximate radius of 200 feet using a safety/search line for only three hours.

10. This Court is of the opinion, and so holds, that this search was inadequate under the circumstances. The visibility under water was very poor, and consequently the diver conducted most of his search by "feel". The current was very strong, which could have caused the jack-up leg to shift positions any number of times. The use of a magnetometer would have been appropriate under the circumstances and much more efficient, as Ken Meyers' subsequent search with a magnetometer demonstrated.

### SALVAGE OF THE MISS JANEL

11. The defendants contend that the plaintiffs' recovery should be reduced because defective salvage methods diminished the salvage value of the MISS JANEL. In support of this proposition, defendants cite *Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89 (5th

Cir.1975). The *Nat G. Harrison* court discussed the intervening/superceding negligence rule and stated,

> In these circumstances the question of whether the intervention of a new and independent cause or force will relieve the original actor from liability, disrupt the causal connection between the original wrong and the injury, or constitute a superceding cause, is to be determined by ascertaining whether the intervening cause, force, or occurrence was reasonably "foreseeable" or could or should have been anticipated.

*Nat G. Harrison*, 516 F.2d at 97 (quoting 100 A.L.R.2d 942, 990 (1965) and citing RST 2d TORTS § 447 (1965)).

■ 12. The defendants in the present action complained that Offshore Inc.'s salvage operations were extraordinarily negligent in several respects. First, they claim that Offshore waited too long to begin salvage operations. The testimony is undisputed, however, that Offshore arrived at the scene of the sunken MISS JANEL on October 25, 1983, only two days after the vessel's sinking. The undisputed testimony of Mr. Statler established that the weather conditions were too rough to begin salvage operations immediately, and salvage began when the weather permitted. This Court finds that the timing of the salvage operation's and the delays occasioned therein did not constitute negligence.

■ 13. During the salvage operations, one of the straps Offshore was using to attempt to lift the stern of the vessel broke unexpectedly. A delay of two days ensued; one day to get a new cable and one day because of rough weather. The defendants also claim that Lee Statton's failure to use a spreader bar in the salvage operations constituted negligence. Lynn Dean testified that under the circumstances a spreader bar should have been used to raise the weakened wooden hull boat. Mr. Statler testified that he thought about using a spreader bar but decided against it because it would require more time and the boat was continuing to beat against the bay floor. Additionally, Mr. Statler believed that attempting to attach a spreader bar to the rigging would have been dangerous. After hearing the testimony and reviewing the exhibits, the Court is of the opinion, and so finds, that the failure of Mr. Statler to use a spreader bar in salvaging the MISS JANEL, a weakened wood hull boat constituted negligence on the part of Offshore. Also, the Court finds that such negligence resulted in additional damage to the MISS JANEL.

■ 14. Having found that the salvage operations were negligently performed, the next step is to determine whether such negligence constitutes an intervening cause, force or occurrence so as to relieve the defendants (the original tort feasors) from their liability. This Court finds that the negligence of the salvor as occurred in this case was reasonably foreseeable and should or could have been anticipated. The defendants reliance on *Nat G. Harrison* is misplaced because the facts in *Nat G. Harrison* are distinguishable from the facts in the present case. In *Nat G. Harrison*, a sunken vessel which was not a total loss at the time it went down, became a total loss after the salvors first intentionally sank the vessel, then negligently allowed seven months to pass before raising the vessel from the bottom. The court there refused to hold those responsible for the sinking of the vessel liable for the damages incurred because of the negligent salvage operations.

■ 15. For the subsequent negligence of the third party to absolve the initial wrongdoer of liability for all of the damages suffered by the injured party, the subsequent negligence of the third party must be so extraordinary that a reasonably prudent person could not have foreseen its occurrence. Thus, in the *Nat G. Harrison* case, no prudent person could have foreseen that a salvor who had been hired to salvage the vessel would instead intentionally sink it, then allow it to sit on the ocean floor for a period of seven months, during which time the vessel became a constructive total loss. (*Id.* at 96–97).

16. Ken Meyers, whose business is locating underwater objects, testified that conducting a search for a submerged object

in waters as muddy as those in Mobile Bay at the time in question by means of a single diver would be foolish unless the party conducting the search knew exactly where the object was submerged before the search began. Defendants contend that they knew the exact location of the loss of the leg because they found the milk jug marker purporting to mark the exact location of shot point #312, but the facts established at trial show that defendants did not know that they actually were on shot point #312 when they conducted their search, and, more important, they did not know that the leg had actually been lost at shot point #312.

17. When Allen Boudreaux and the diver got to the area which they assumed was shot point #312, the diver searched by feel in the muddy water during a search which lasted only three hours (at most) in total time. There was no testimony as to the length of time the diver actually searched. The diver, now deceased, reportedly found three holes and assumed that the three holes had been made by the pontoons of the jack-up barge. Because the holes were empty, he assumed from this that the leg was buried under the mud on the bottom of the bay. After making this assumption, which was accepted by all the defendants, no other search was conducted by the defendants.

18. Assuming, *arguendo*, that the three holes which the Grant diver found were in fact holes made by the three pontoons, it does not automatically follow that this was the location where the jack-up leg was lost. The Court is unpersuaded that the search was reasonable or full under the circumstances.

19. The search made by Grant appears to be inadequate, if not foolish, under the circumstances (muddy waters, previous rough weather, inexact location). Comparing the search made by Grant with the searches made in the two cases cited by defendants, however, points out even more the inadequacy of the search conducted by the defendants in this case. In *Allied Chemical,* one vessel sought to recover from the owner of a sunken vessel in the Mississippi River for damages resulting from an allision with the submerged vessel. Holding that the owner of the sunken vessel had fulfilled its search obligations under 33 U.S.C. § 409, in spite of not locating and removing the sunken vessel, the Fifth Circuit absolved the owner of the sunken vessel of any liability in the case. That search, however, included several teams of marine surveyors and divers, employing sophisticated equipment and techniques, searching at least a three mile stretch of the Mississippi River. In addition to these teams of surveyors and divers, at least three other boats also participated in the search for the sunken vessel. *Allied Chemical,* 661 F.2d at 1061.

20. The other case cited by defendants is *Nunley v. M/V DAUNTLESS COLOCOTRONIS, supra.* The search conducted in that case was, likewise, much more extensive than the search conducted here. In *Nunley,* after the owner of the sunken barge first searched the surface of the river in the area in which the barge sank, the owner also searched the area with a fathometer and a magnetometer. The magnetometer detected an object appearing to be the sunken barge in 67 feet of water, but the owner continued to search up stream to make sure nothing else could be found. At the time its search was conducted, the owner of the barge could not send a diver down to definitely indentify the object located because the river conditions were too dangerous. The court said:

> In a factual situation such as this, where an owner has made a diligent and good faith search for his vessel, it is precluded from identifying a wreck as his own— *where everything that could reasonably have been done was done*—the standards supplied by the Fifth Circuit has been met.

*Nunley,* 661 F.Supp. 1096, 1105–06 (District Court case after remand from the Fifth Circuit) (emphasis added).

According to *Nunley,* the owner of a sunken vessel is absolved of liability only when he has done everything that could reasonably be done to find the sunken object.

21. Compared to the extensive searches involving numerous persons and vessels and the use of sophisticated equipment in

the *Allied Chemical* and *Nunley* cases, it is clear that Grant's employing a single diver for a total of three hours to search by feel in the muddy waters of Mobile Bay at a point that could not be determined definitely to have been the spot where the leg was lost was not an adequate search in this case. The defendants will not be held to be absolved of their responsibility for finding, marking and removing the jack-up leg. Further emphasis of the inadequacy of Grant's search is the fact that Ken Meyers, using proper equipment for a search of this type, found the leg in approximately 15 minutes of search time.

22. The undisputed testimony established the need to raise the vessel as quickly as possible. Mr. Sutton testified that he contacted the only competent salvor in the area, Mr. Statler, to salvage the MISS JANEL. Undisputed testimony established that had the plaintiffs waited for another salvor to reach the Mobile area to salvage the vessel, there would have been no vessel left to salvage. Undisputed testimony further established that had the MISS JANEL been left subjected to the forces of the open waters of Mobile Bay any longer than she was, in all likelihood, she would have broken apart completely. The plaintiffs' decision to hire Mr. Statler was not negligent under the circumstances.

## SALVAGE VALUE

23. Once Mr. Statler returned to his yard with the MISS JANEL, Mr. Sutton asked for bids on the salvage of the vessel from several shrimpers and boat repair yards in the area who might be interested in purchasing the MISS JANEL. The salvage bids he received ranged from $3,250–$5,000. Defendants' value expert, Chris Collier, initially placed the salvage value of the MISS JANEL at $10,000. Mr. Statler purchased the MISS JANEL for $5,000, the highest bid received for the salvage value.

24. Even if Mr. Statler was negligent in his salvaging of the MISS JANEL, defendants presented no testimony indicating that the salvage methods employed by Mr. Statler were so extraordinarily negligent or outrageous as to be unforeseeable by those causing the sinking of the MISS JANEL. Accordingly, the award to the plaintiffs will be reduced only by the $5,000 actually received on the salvage value of the MISS JANEL.

## PREJUDGMENT INTEREST

25. In admiralty cases, the award of prejudgment interest is the rule rather than the exception. *Miller Indus. v. Caterpillar Tractor Co.*, 733 F.2d 813, 822 (11th Cir.1984). In allision cases, the prejudgment interest should run from the time of the accident. *Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.*, 792 F.2d 489, 492 (5th Cir.1986). The parties in this case have stipulated to 8% as the rate of interest.

26. This Court finds that defendants are jointly and severally liable to plaintiffs in this cause and that plaintiffs are entitled to recover from these defendants $75,000 for the value of the vessel, $15,000 in salvage costs, $1,575 in surveying fees, $600 for lost personal effects of the crew, $350 for groceries and stores and $350 for ice. These total damages are to be reduced by $5,000 for the post sinking salvage value of the hull.

## COUNTERCLAIM

27. The defendant Elevating Boats, Inc. filed a counter-claim for the value of the lost leg and presented evidence that the leg was valued at $15,000. The testimony was clear, however, that Elevating Boats conducted no search for this $15,000 piece of equipment after it was lost and, in fact, Mr. Acosta, the General Manager of Elevating Boats, testified that he was satisfied that a thorough search for the leg had been made and that he believed that the leg was stuck under the mud and that that was where it would remain. It was also clear that Lynn Dean, the President of Elevating Boats, was not even aware of the loss of the leg until after the sinking of the MISS JANEL, even though the LOGGING ELEVATOR had been required to leave its jobsite to make a special trip to Elevating Boats' headquarter to have the leg replaced. Further testimony established that Elevating Boats made no effort to recover the leg when it was of-

fered to it after its salvage. This Court finds the counterclaim to be without merit.

28. Based on the foregoing, this Court finds in favor of the plaintiffs and imposes judgment in plaintiffs' favor and against defendants, Elevating Boats, Inc. and Grant Geophysical in the amount of $87,875.00. Plaintiffs' damages are calculated as follows:

| | | |
|---|---|---|
| 1) Presinking value of the MISS JANEL | | $75,000.00 |
| 2) Plus the cost of raising the MISS JANEL | | 15,000.00 |
| 3) Salvage Survey | | 1,575.00 |
| 4) Plus the value of the lost ice, groceries & personal effects— | | 1,300.00 |
| | Sub total | $92,875.00 |
| 5) Less reasonable salvage value of the MISS JANEL | | −5,000.00 |
| | TOTAL | $87,875.00 |

To this damages award total the Court adds prejudgment interest of $ 37,325.94 (8% per annum from October 23, 1983 through the date of judgment).

Judgment will be entered by a separate document.

## JUDGMENT

By a document bearing the same date as the date of this judgment, this Court determined that the plaintiffs in this action are entitled to recover damages from the defendants as set forth below. The Court enters the following final judgment. The plaintiffs Miss Janel, Inc. and U.S. Fire Insurance Company shall have and recover from the defendants Elevating Boats, Inc. and Grant Geophysical Corporation in the principal sum of $87,875.00 plus interest of $37,325.94 (8% per annum from October 23, 1983 through the date of judgment) for a total sum of $125,200.94 (One Hundred Twenty-five Thousand, Two Hundred and 94/100 Dollars) in full and complete satisfaction of all of plaintiffs' claims arising out of this litigation. Said defendants are jointly and severally liable. Costs are taxed to the defendants.