**TIDEWATER MARINE, INC. and
Twenty Grand Offshore, Inc.**

v.

**SANCO INTERNATIONAL, INC., et al.**

**No. CIV.A. 96–1258.**

United States District Court,
E.D. Louisiana.

July 24, 2000.

William B. Gibbens, III, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, LA, for Plaintiffs.

Joseph E. LeBlanc, Jr., King, LeBlanc & Bland, New Orleans, LA, for Defendants Sanco Intern., Inc., Saber Steel Corp., Rig Ventures, Inc., Emilio Sanchez.

Anthony Reginelli, Jr., Baynham, Best & Reginelli, Metarie, LA, for Third-Party Defendant, Professional Divers of New Orleans, Inc.

Georges M. Legrand, Mouledoux, Bland, Legrand & Brackett, New Orleans, LA, for Third-Party Defendant, Subsea Intern., Inc.

## MEMORANDUM OPINION

MENTZ, District Judge.

Tidewater Marine, Inc. (Tidewater Marine) and Twenty Grand Offshore, Inc. (Twenty Grand) (collectively referred to herein as Tidewater) brought this suit in admiralty for damages to the M/V MAC TIDE 63, an offshore tug. The MAC TIDE 63 was damaged when it struck a submerged, unlighted obstruction to navigation and sank in the Gulf of Mexico, in South Timbalier Block 96 off the coast of Louisiana. The obstruction was a portion of the D/B OCEAN STAR, a three-legged jack-up rig, which had broken while under tow eleven months prior to the allision.

Tidewater Marine was the operator of the MAC TIDE 63, which was owned by Twenty Grand. Sanco International, Inc. (Sanco) owned the OCEAN STAR. Tidewater brought its damage claim against: (1) Sanco, as the owner of the obstruction; (2) Saber Steel Corporation (Saber), which contracted on behalf of Sanco with various third parties with respect to marking the site in accordance with Coast Guard requirements; (3) Rig Ventures, Inc. (Rig Ventures) which held an ownership interest in the OCEAN STAR for one day prior to its transfer to Sanco; and (4) Emilio Sanchez, Sr. (Sanchez), the President and sole shareholder of these companies, in an attempt to pierce the corporate veil and hold him personally liable.[1] These four defendants are referred to collectively as the Sanco Group.[2]

The corporations in the Sanco Group brought third-party claims against Professional Divers of New Orleans, Inc. (PDNO) and Sub Sea International, Inc. (Sub Sea), for acts and omissions resulting in the site being marked by an unlighted buoy. The Sanco Group also asserted a counter-claim for contributory negligence against Tidewater for alliding with the obstruction. Sub Sea asserted a cross-claim against PDNO, a counter-claim against Sanco, Saber, and Rig Ventures, and a third-party complaint against Sanchez alleging that each was responsible for the site not being properly marked.

## I. FACTUAL FINDINGS

### A. The Obstruction to Navigation

Rig Ventures purchased the OCEAN STAR on or about February 14, 1995, and sold it the next day to Sanco. On March 21, 1995, one of the rig's jack-up legs broke while under tow. The remaining two legs and mat had to be cut free in order for the rig's tow to continue. Oceaneering International, Inc. (Oceaneering), a diving contractor, cut the rig's legs under the direction of Frank Ruiz, a salvor, who was present on the job as Saber's agent/representative and was in contact with Sanchez via cellular telephone. Ruiz decided where to cut the legs in an attempt to facilitate later salvage and also to accommodate vessel traffic in the area. When the legs were cut, the mat fell to the floor, with the two legs sticking up approximately 18 feet from the surface of the water.

The Sanco Group was aware of Sanco's obligation, as owner of the obstruction, to properly mark it as a hazard to navigation.

Saber through Sanchez and his son, Emilio Sanchez, Jr. (Sanchez, Jr.), who was employed by Saber Steel at the time,[3] took responsibility for marking the submerged obstruction. Oceaneering installed a

---

**1.** During the trial, the court bifurcated the issue of whether to pierce the corporate veil and hold Sanchez liable as the alter ago of his companies. Therefore, that issue is not addressed herein.

**2.** All three companies are engaged in various aspects of the scrap metal business.

**3.** Sanchez, Jr. is the Vice–President and Secretary of all three Sanco Group corporations.

Coast Guard approved hazard buoy with a red flashing light to mark the obstruction on or about March 25, 1995.

In May or June, 1995, Saber hired Ruiz to attempt to salvage and/or remove the obstruction. When Ruiz returned to the site, he was unable to find the obstruction because the buoy had been lost or stolen. He located the obstruction by dragging anchors. For over a month, Ruiz made several attempts to raise the mat. Finally, in an attempt to lessen the weight, he allowed the front end to break off and sink to the floor. This left the mat in two pieces with one leg protruding only three feet from the water's surface. There were no more attempts to remove the obstruction or cut the legs from the mat prior to the allision nine months later, even though the evidence established that it would have taken only one day to cut and drop the legs.

Richard Jaross, a business partner of the Sanco Group, warned the Sanchezes as early as April 18, 1995 (almost 10 months before the casualty and before Ruiz attempted salvage), that the legs should be cut off. He explained that time was of the essence. He further warned them on August 22, 1995, almost six months before the casualty, that they needed to get the mat out of the way.

Despite actual knowledge of the hazard to navigation, Sanco and Saber waited until after the allision (almost a year later) before cutting the legs. When the legs were finally cut, the clearance went from 3' to 48' below the surface, significantly reducing the hazard to navigation.

In June, 1995, Saber rented a buoy from World Marine Transport & Salvage, Inc. (World Marine) to mark the obstruction. The rental buoy was installed on June 23, 1995. This buoy was an SB–826 Sentinel, 8 feet wide, 21 feet tall, with an 8–mile maximum range radar reflector, light, and horn. It had a value of approximately $25,000. The buoy was rented to Saber at a cost of $4,455, plus an insurance premium of $1,100 every six weeks.

In mid-November, 1995, Sanchez sent divers to survey the mat for the purpose of cutting the legs. They reported to him that they were unable to locate the buoy or the obstruction. Sanchez subsequently learned in late-December, 1995 that the divers in fact had not gone out to the site and had falsely reported the buoy as lost. In the meantime, on December 14, 1995, Sanchez notified the United States Coast Guard that the obstruction was reportedly unmarked. He also asked his son to purchase a replacement buoy, rather than to rent another one, to save money.

On or about December 14, 1995, Sanco purchased a hazard buoy, light assembly, chains and anchor weights from Dor–Mar, Inc. Sanchez, Jr. did not refer to the dimensions of the rented buoy in purchasing a replacement, but he did have Dor–Mar confirm with the Coast Guard that the purchased buoy was Coast Guard approved for marking an underwater obstruction. In addition, his father reviewed and approved the specifications on the purchased buoy.

The purchased buoy was much smaller than the rented buoy, and it did not have a radar reflector or a horn. It had "HAZARD" printed in bold orange letters and displayed the diamond maritime symbol for hazard. The rental buoy cost approximately $25,000; whereas the purchased buoy cost approximately $1,238.00.

By facsimile dated December 21, 1995, Sanchez advised the Coast Guard that they still were aware of the hazard to navigation, that they "were on top of the situation," and had purchased a buoy which would be shipped to Port Fourchon for ultimate installation at the location of the obstruction.

## B. The Missing Buoy Light

Sanchez, Jr., acting on behalf of Saber, contacted PDNO in mid-December, 1995 to perform an underwater video survey of the mat and legs and to install the purchased buoy at the obstruction. Because Sanco

had been advised that the divers who reported the buoy missing had not actually gone out to the site, Sanchez, Jr. also asked PDNO to verify whether the rental buoy was still on location.

Sanchez, Jr. arranged for the purchased buoy, light assembly, chain, and anchor weights to be sent to the Bollinger Shipyard facility in Fourchon, Louisiana. The buoy, weights, chain, and light assembly were shipped in three crates. Sanchez, Jr. told PDNO to pick up the buoy at Bollinger. On the morning of January 12, 1996, the buoy, the anchor, chain, and a light assembly were loaded aboard the M/V EMAR J. EYMARD at Bollinger Shipyard. PDNO had chartered the EYMARD to take its crew to the location of the obstruction.

The PDNO supervisor for the job, Richard Hastings, arrived at the Bollinger Shipyard facility in Fourchon, Louisiana on January 11, 1996, approximately four hours before the vessel departed. During this four-hour period, Hastings made no effort to inspect the buoy material, contrary to the expectations of Larry Tomlinson, President of PDNO.

Kris Hepting, Vice–President of Operations with PDNO, telephoned Sanchez, Jr. two or three times on the day of the job before the vessel left port to determine what equipment would be needed to set the buoy into the water. Sanchez, Jr. did not have the information at hand, but called back with the height and weight of the buoy, the length and size of the chain, and the weight of the anchor. He did not mention the light assembly. Sanchez also gave Hepting the coordinates for the obstruction.

The EYMARD crew found the rented buoy still on site. The PDNO divers conducted an underwater survey of the mat and legs, including taking video of the obstruction and pneumo-fathometer (or depth) readings on the obstruction, and determined the shallowest areas. PDNO then placed the purchased buoy in the center of the mat, but failed to install its light assembly. PDNO left the site without installing the light.

During the return trip, a PDNO employee brought the light to Richard Hastings in the wheelhouse. Hastings did not call his office at that time for instructions. After discussion with Captain Lewis about the rough weather and taking into account that the site, at that time, was properly marked by the lighted, rental buoy, Hastings decided not to return to the site to install the light. The next day, he gave the light to Kris Hepting, who said he would return it to Saber. Instead, Hepting put the light in a storage shed where it stayed until after the allision. Hepting did not think the light was important, but he did tell Larry Tomlinson, President of PDNO, that he had the light and planned to send it back to Saber Steel.

At no time prior to the allision did PDNO advise the Sanco Group or Sanchez, Jr. that it had installed the buoy without the light. To the contrary, PDNO gave them every reason to believe that the buoy had been properly installed. Sanchez, Jr. did not specifically inquire about the status of the light because PDNO had told him that everything was fine. Sanchez, Jr. was in contact with Larry Bourg while the PDNO crew was on its way back from site, and Bourg, who at that time did not know that the light had not been installed, assured him that everything was fine and working.

Notwithstanding that Hastings, Hepting, and Tomlinson, were aware that the light had not been installed, PDNO issued a wreck site report prepared by Hastings to Saber confirming that "another hazard buoy" had been installed, but failed to report that the light had not been installed or that PDNO had possession of the light. Work sheets attached to PDNO's report also state that "another wreck buoy" was installed by PDNO's dive crew.

After receiving the January 16, 1996 letter from PDNO, Sanchez, Jr. had several further contacts with PDNO through

Bourg. He contacted Bourg to ensure that the purchased buoy would not drift; he conferred with him about returning to the site in six months to change the batteries on the light; and he asked PDNO to bid on removing the rental buoy and salvaging the obstruction. Bourg never advised Sanchez, Jr. that PDNO had not put the light on the buoy, but the evidence does not show that Bourg was aware that the light had not been installed. Sanchez, Jr. did speak to Hastings, who was aware of the problem, but Hastings did not mention the light. Because of assurances from PDNO, and its failure to inform any of the Sanco Group, about the light, the Sanco Group believed that the site had been properly marked.

PDNO did not have clear instructions on the scope of its work and would have benefited by having a Sanco or Saber company representative on the job, as is customary practice. The evidence does not establish that Sanchez, Jr. put any of his instructions in writing or that he gave PDNO a copy of Dor–Mar's printed specifications on the buoy. The evidence also does not establish that he specifically advised PDNO that the purchased buoy was going to be shipped in three crates, that the buoy had a light, or that the light needed to be assembled. Notwithstanding this lack of communication, the testimony of Captain Lewis, the relief captain on the PDNO chartered vessel, shows that PDNO crew members were aware of the existence of the buoy's light assembly prior to commencing the dive operations. Captain Lewis testified that the box containing the light was marked "water light" and that PDNO's dive tenders assisted in loading that box onto his vessel. And, after arriving at the site, Capt. Lewis showed the light assembly to a PDNO dive tender.

PDNO argues that it should not be held accountable for not notifying Saber that the light had not been installed on the

hazard buoy because (i) it believed the purchased buoy was to mark the obstruction for survey purposes only and assumed the lighted rental buoy would remain at the site or, alternatively, (ii) it assumed that the underwater obstruction had been removed and a lighted buoy was no longer needed.

The evidence shows that PDNO was aware that the purchased buoy was intended to mark an obstruction as a hazard to navigation. Sanchez, Jr. clearly advised PDNO that the buoy on site might be missing. PDNO was aware that the obstruction needed to be marked and that if the buoy on site was missing, the one they were going to set would have been the replacement. In addition, PDNO was aware of the obstruction's presence as a result of the underwater survey it conducted.

The evidence also shows that after PDNO returned from the site with the light, at least one person, Larry Tomlinson, President of PDNO, had knowledge of both the fact that the light had not been installed and that PDNO wanted to remove the rental buoy. Notwithstanding these facts, prior to the sinking, PDNO never notified Saber that the light had not been installed and was sitting in PDNO's warehouse. To the contrary, PDNO's actions and inactions resulted in the Sanco interests incorrectly assuming that the light had been installed on the purchased buoy.[4]

The court likewise cannot accept PDNO's argument that it thought the underwater obstruction had been removed, inasmuch as PDNO had submitted bids on removal of the obstruction up until the day of the allision. Nor does the evidence support PDNO's argument that the light would have been too difficult to install aboard the vessel once they were underway.

---

4. According to PDNO's own expert, David Cole, a "wreck buoy" is supposed to be lighted. Cole testified that if he saw an entry in a

report that stated "Set another wreck buoy" he would understand that to mean a lighted buoy.

## C. Removal of the Rental Buoy

Sanchez, Jr., acting on behalf of Saber, contacted Sub Sea on January 29, 1996, about delivering equipment to a drilling rig, the D/B OCEAN EXPLORER, located in South Pelto 21. In a subsequent conversation, he asked if Sub Sea could also pick up the rental buoy located in South Timbalier 96, which was only 5 or 6 miles from the drilling rig. He explained that he was eager to remove the rental buoy to "get it off rent," because he had replaced it with a purchased buoy. His written bid request stated with respect to the buoy, only: "We would also like to know how much you would charge for picking up a lighted buoy located at lat. 28.743018 long. 90.625668. It is a rented buoy that needs to be returned.... Buoy is in 56 feet of water." Later, at the request of Sub Sea's Operations Manager, Wesley Freeman, Sanchez, Jr. provided the following additional information about the buoy:

> Buoy is marked as Saber Steel ST96/Model SB–826 red fiberglass buoy / consists of lantern with re [sic] lens, solar generator, 1 shot (90 feet) of 1 1/8" stud link chain, bridle and swivel assembly 2 1/14" shackles, 2 5000 pound concrete sinkers.

> If you need additional information, don't hesitate to call.

When Freeman asked Sanchez, Jr. what the buoy was marking, he replied that it was marking a submerged pad. He did not describe the protruding legs, the 3 foot clearance, or where the buoy was in relation to the mat. He did not advise Sub Sea that the submerged pad or anything else at the location was a hazard or obstruction to navigation. To the contrary, he told Sub Sea that the water was 56 feet deep at the location. He also did not describe the purchased buoy or ask Sub Sea to check on the status of the purchased buoy.

Sub Sea was hired to do the job. It used the M/V MR. FRANK, a liftboat, to perform its work. The navigation crew consisted of Captain Richard McLean, a mate, a cook, and a deckhand. The dive crew consisted of two divers and a tender. All were employed by Sub Sea. There were no representatives of the Saber Group aboard the vessel.

After delivering the equipment to the OCEAN EXPLORER, the MR. FRANK traveled the five or six miles to the buoy during daylight with visibility of 10 or 12 miles. Capt. McLean had the longitude and latitude coordinates for the buoy's location. With the coordinates, he was able to use the vessel's Loran system to obtain the course, distance, direction, speed and estimated time of arrival at the buoy's location. He did not consult his navigational charts or Notices to Mariners at any time during the job.

The obstruction was listed on current Coast Guard navigational charts. In addition, the obstruction had been the subject of five Notices to Mariners, including most recently, Notices issued on December 19 and 26. The obstruction also was the subject of a broadcast Notice to Mariners on December 14, 1995, but there is no evidence that Capt. McLean was in a position to hear that broadcast.

Even though Sub Sea normally would advise its dive crews of any dangerous conditions, none of the Sub Sea personnel on the MR. FRANK knew that the buoys were marking a hazard or obstruction to navigation; they knew only that the buoys marked a submerged pad of some kind.

Upon arrival at the site of the obstruction, they saw that there were two buoys approximately 50 feet apart. The dive crew knew that they were to pick up a "marker buoy" and called the shop to verify which buoy to pick up. Capt. McLean proceeded to the larger of the two buoys (the rental buoy) and positioned downwind from the it and as far away as possible to avoid jacking down on the submerged pad. After jacking down and lifting the vessel without incident, Capt. McLean went to sleep.

By this time, it was dark, and both buoys, which were in front of the MR. FRANK'S bow, were illuminated by spotlights from the vessel. The rental buoy, which was approximately 60 feet out from the bow, was the closest of the two buoys. The purchased buoy was positioned another 50 feet away from the rental buoy. As the wheelhouse is approximately 60 feet from the bow, the purchased buoy would have been approximately 170 feet from the MR. FRANK's wheelhouse.

The dive supervisor, Stephen Barkely, and the diver, John Sutton, noticed at some point during the evening that the smaller buoy was not lighted. Neither they nor any of the other Sub Sea employees on the MR. FRANK ever discussed this fact. Sutton did not see the obstruction during his dives, one of which was to a depth of . . . . . . . . . . feet, because visibility was only two feet.

Sub Sea retrieved the rental buoy without incident. Upon departing he site in the dark at 4:00 a.m., Capt. McLean, who was at the wheel, did not notice whether the other buoy was lighted. Based upon what he knew at the time, Capt. McLean did not feel that he was leaving a dangerous situation at the site.

After the MR. FRANK returned to port, the Sanco Group did not inquire about the status of the purchased buoy.

There is no express contractual agreement between Saber and Sub Sea requiring Sub Sea to inspect, mark, or report on the condition of the rental buoy. There is likewise no evidence that Sub Sea knew that the Sanco Group was relying on it to assure that the remaining buoy conformed to Coast Guard standards before removing the rental buoy. *See Tidewater Marine, Inc. v. Sanco International, Inc.* No. Civ. A. 96–1258, 1997 WL 543108 * 9–10 (E.D.La. Sept. 3, 1997).

The presence of a wreck buoy does not necessarily mean that it is currently marking a hazard to navigation because the hazard may have been eliminated. Even

so, the presence of the two buoys, and the fact that one buoy was to remain on site, together with the fact that the liftboat and divers would be working in close proximity to the buoys, should have caused Capt. McLean to question the exact nature of what the buoys were marking. Reasonable maritime practice would require, at a minimum, consultation with current charts. Had Capt. McLean consulted the charts and Notices to Mariners which Sub Sea made available to him, he would have had known that the buoys were marking an obstruction to navigation.

Capt. McLean testified that had he known about the obstruction and had he noticed that the remaining buoy was unlit, he would not have left the site without ensuring that the area was marked with a lighted buoy. Sub Sea's operations manager, Freeman, testified that had he known the exact nature of the obstruction, he would not have sent the dive crew to the site.

Notwithstanding his ignorance of the hazard, Capt. McLean encountered no problems in navigating the liftboat at the site. Sub Sea performed its job exactly as requested by Saber and without incident.

The MAC TIDE 63 allision occurred within five days of Sub Sea's removal of the rental buoy.

Sub Sea and Saber asserted claims against each other based on the provisions of their Master Time Charter Agreement. Sub Sea, as owner, claims that Saber, as charterer, was obligated to obtain insurance to protect and indemnify Sub Sea from the third party claims, such as those asserted against it by Tidewater.

Article VIII of the Time Charter contains the only insurance requirement applicable to Saber, as charterer:

CHARTERER agrees to provide full and adequate insurance on its employees and property, and/or those of its subsidiary or affiliated firms, and it further agrees to cause such policies to waive subrogation in favor of OWNER, et al

for the risks assumed by CHARTERER under this Agreement.

This insurance provision would apply to any employees or property of Saber involved in the recovery of the rental buoy, which there were none. The provisions do not apply to negligence on the part of Sub Sea. Article VIII does not require the naming of Sub Sea as an "additional assured," but only a "waiver of subrogation" with respect to "risks assumed by CHARTERER" under the Time Charter. The "risks assumed" by Saber did not include the obligation to provide insurance for third party claims against Sub Sea.

■ Saber claims that under Article V of the Time Charter, Sub Sea was obligated to leave the rental buoy on site and notify Saber that the purchased buoy was unlit. Article V provides:

> OWNER shall, upon request, provide the services to CHARTERER as requested and directed by CHARTERER. If OWNER determines it is not safe to perform any services as requested under any given conditions, OWNER shall immediately notify CHARTERER of such unsafe condition, and shall not engage in any activity which may cause damage or loss to life or property. OWNER, its masters and crew have the sole discretion, authority, and last word as to whether any request of CHARTERER should or should not be carried out. OWNER, its masters and crew shall not, under any circumstances, undertake any task by request of CHARTERER which it or they shall deem unsafe; and OWNER, its masters and crew shall have the authority and responsibility not to undertake any task which it or they shall deem improper or unsafe. Should CHARTERER require OWNER to undertake any activity deemed unsafe by OWNER, CHARTERER shall indemnify, defend and hold OWNER harmless against any and all claims for injury or death resulting therefrom to any person and for any and all property damaged, including but not limited to the vessel,

as a consequence thereof. OWNER shall further provide competent and capable employees and crewmembers for the operation of any Vessels chartered hereunder.

Article V addresses the performance by Sub Sea of Saber's requested services. It obligates Sub Sea to perform the services as requested and directed by Saber, and to provide a competent crew to operate the vessel, but allows Sub Sea the discretion to back out of any jobs that it determines to be unsafe. Sub Sea did not violate Article V because it performed the services exactly as requested by Sub Sea. Sub Sea never made a determination, partly because of inadequate and inaccurate information provided by Saber, that removal of the rented buoy was unsafe. Because Sub Sea performed its contractual services as requested and without incident, there is no basis for finding that Sub Sea violated Article V.

### D. The Sinking of the M/V MAC TIDE 63

Five days after Sub Sea removed the rented buoy, leaving behind the unlit purchased buoy, the M/V MAC TIDE 63 struck the underwater obstruction. At the time of the allision and sinking, it is undisputed that the purchased buoy marking the obstruction was not lit.

On the day of the allision, February 12, 1996, Captain Bilich, the master of the MAC TIDE 63, arrived in Fourchon and boarded the vessel. During the hours he was docked in Fourchon, he took inventory of food in the galley, attended to crew member disputes and conducted an "abandon ship" drill. He did not review any of the Notices to Mariners or navigational charts. Capt. Bilich testified that he had been on his vessel for approximately 35 hours prior to departure. He thus had 35 hours to update his charts and review the Notices to Mariners, yet he failed to do so.

The MAC TIDE 63 departed from Fourchon at 8:30 p.m. Initially, Capt. Bilich chartered a course that would not take him through South Timbalier 96. About an

hour into the trip, he altered his course when he detected fishing vessel traffic and a line of offshore oil rigs in the area.

Capt. Bilich entered way points into the vessel's Global Positioning System (GPS). The GPS tells whether the vessel is on course to get to its destination and is an aid to navigation. Capt. Bilich plotted his course on the chart every hour. He also constantly monitored his radar and kept a close lookout. Visibility was excellent, and the seas were two to three feet.

The purchased buoy stood approximately 30 inches above the water line without the light installed, so that in two to three foot seas the entire buoy could be submerged in a wave trough. While the buoy had a metal screen inserted in the light which apparently was intended to be a radar reflector, it was inadequate to reflect radar in any conditions other than very calm seas. Because of its height and the nature of the reflector, the buoy was not detectable by radar in two to three foot seas, which is relatively calm for the Gulf of Mexico.

Buoys, radar, Loran, charts, Notices to Mariners, and lookouts are all aids to navigation. None of these alone can be considered absolute indicators of sea conditions. Indeed, the charts state: "The prudent mariner will not rely solely on any aid to navigation, particularly floating aids."

The obstruction was listed on current navigation charts at the time of the incident. It is not known whether there were current charts aboard the MAC TIDE 63 because Capt. Bilich failed to inventory the charts on the vessel, in contravention of Tidewater policy. Capt. Bilich also violated Tidewater policy by failing to review and chart the Notices to Mariners. The obstruction had been the subject of five Notices to Mariners prior to the allision, including, most recently, the Notices to Mariners issued on December 19, 1995 and December 26, 1995.

At the time of the allision, Capt. Bilich was aware of the obstruction from the OCEAN STAR mat. He had actual knowledge of the obstruction because he had spotted the rental buoy six months earlier in August 1995. He also knew what it marked because he had been told about the obstruction a year prior to the allision by another Tidewater captain. Unfortunately, Capt. Bilich was not aware that his new course was taking him through South Timbalier 96. If Capt. Bilich had consulted current or updated charts, he could have navigated around the area and avoided the accident.

Capt. Bilich violated responsibilities he held by virtue of his license, as well as Tidewater's own company policy requiring the use of updated charts.

## II. *CONCLUSIONS OF LAW*

The court has jurisdiction over this matter under its admiralty and maritime jurisdiction, 28 U.S.C. § 1333.

Under the law of the case doctrine, the court adopts the findings and legal analysis of Judge Vance in *Tidewater Marine, Inc. v. Sanco International, Inc.*, No. CIV. A. 96–1258, 1997 WL 543108 (E.D.La. Sept. 3, 1997).[5]

The Pennsylvania Rule of law presumes that any party to a maritime accident who violates a federal statute is at fault for the allision. The Rule shifts the burden of proof as to causation on the violator to prove that the violation could not have been a contributing cause of the allision. The Pennsylvania Rule applies in allision cases where those responsible for properly marking stationary objects in navigable waters, including underwater obstructions, failed to do so. *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir.1991) (citing *Sheridan Transp. Co. v. United States*, 834

---

5. This case was originally assigned to Judge Vance of this district who issued written reasons on the parties' pre-trial motions to dismiss and for summary judgment in the cited opinion.

F.2d 467, 478 (5th Cir.1987)) (*Sheridan I*), *appeal after remand,* 897 F.2d 795, 799 (5th Cir.1990) (*Sheridan II*).

■ The rule of *The Pennsylvania* concerns only the burden of proof for showing causation; it does not determine ultimate liability for damages. *United Overseas Export Lines, Inc. v. Medluck Compania Maviera, S.A.,* 785 F.2d 1320, 1325 (5th Cir.1986); *Otto Candies, Inc. v. M/V MADELINE D,* 721 F.2d 1034, 1036 (5th Cir.1983). All parties against whom the rule is applied may be liable if their negligence proximately caused the accident, and damages are to be assessed in accordance with the principles of comparative negligence. *Sheridan Transp.,* 834 F.2d at 478 (citing *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 1713, 1715–16, 44 L.Ed.2d 251 (1975)); *Otto Candies,* 721 F.2d at 1036; *Allied Chem. Corp. v. Hess Tankship Co.,* 661 F.2d 1044, 1057–59 (5th Cir.1981); *Alamo Chem. Transp. Co. v. M/V Overseas Valdes,* 398 F.Supp. 1094, 1104–07 (E.D.La.1975)

■ A duty of care may be derived not only from statutory standards, but also from the dictates of reasonableness and prudence under the given circumstances of a case. *See Coumou v. United States,* 107 F.3d 290, 295–96 (5th Cir.1997), *withdrawn and superseded in part on reh'g by Coumou v. United States,* 114 F.3d 64 (5th Cir. 1997) ("The fact that the government did not violate a statute, however, does not end our inquiry. The general maritime law of negligence recognizes a duty of reasonable care under existing circumstances....")

■ "Negligent conduct on the navigable waters that causes loss to another constitutes a maritime tort." *United States v. M/V BIG SAM,* 681 F.2d 432, 443 (5th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983). A party's negligence is actionable under general maritime law only if it is a "legal cause" of the plaintiff's injuries. *See Do-naghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 648 (5th Cir.1992); *Chavez v. Noble Drilling Corp.,* 567 F.2d 287, 289 (5th Cir.1978). "Legal cause is something more than 'but for' causation." *Donaghey,* 974 F.2d at 648 (quoting *Thomas v. Express Boat Co., Inc.,* 759 F.2d 444, 448 (5th Cir.1985) (citations omitted)). A defendant's negligence must be a "substantial factor" in causing the injury. *Id.* The term "substantial" is defined as "more than but for the negligence, the harm would not have resulted." *Chavez,* 567 F.2d at 289 (citing *Spinks v. Chevron Oil Co.,* 507 F.2d 216, 222–23 (5th Cir.1975)).

■ When more than one party is at fault, the comparative negligence standard applies. It provides that when two or more parties have contributed by their fault to cause property damage in a maritime collision, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault.

■ The "superseding cause" doctrine is similar and related to the principle of "proximate causation." *See Exxon,* 517 U.S. 830, 837, 116 S.Ct. 1813, 1818, 135 L.Ed.2d 113 (1996). The doctrine is applied when a defendant's negligence substantially contributes to the plaintiff's injury in fact, "but the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Id.* (quoting 1 T. Schoenbaum, *Admiralty and Maritime Law* § 5–3, at 165–66 (2d ed.1994)). The doctrine essentially asks whether a defendant "is to be held liable for an injury to which he has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which he is not responsible." *Nunley v. M/V DAUNTLESS CO-LOCOTRONIS,* 727 F.2d 455, 464 (5th Cir.), *cert. denied,* 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 63 (1984) (quoting Prosser, *Law of Torts,* 4th ed. 270). The Fifth Circuit has explained the operation of the doctrine of superseding causation as follows:

The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if

(a) the actor at the time of the negligent conduct should have realized that a third person might so act, or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

*Donaghey,* 974 F.2d at 652 (citing *Nunley,* 727 F.2d at 464–65 (quoting Restatement (Second) of Torts § 447)).

For the subsequent negligence of a third party to absolve the initial wrongdoer of liability for all of the damages suffered by the injured party, the subsequent negligence of the third party must be so extraordinary that a reasonably prudent person could not have foreseen its occurrence. *Miss Janel, Inc. v. Elevating Boats, Inc.,* 725 F.Supp. 1553, 1569 (S.D.Ala.1989).

■ "A person who voluntarily assumes a duty owed by another and then breaches that duty becomes liable to one who is injured as a result of the breach." *Miss Janel, Inc.,* 725 F.Supp. at 1567 (citing *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955)). The "Good Samaritan" rule, as this principle is known, is applicable in maritime cases. The rule is set forth in section 324A of the Second Restatement of Torts:

One who undertakes gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm re-sulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A.

An actor's specific undertaking of the services allegedly performed without reasonable care is a threshold requirement to section 324A liability. *See, e.g., Patentas v. United States,* 687 F.2d 707, 716 (3d Cir.1982) ("The foundation of [324A] is that the defendant specifically has undertaken to perform the task that he or she is charged with having performed negligently"). The scope of this undertaking defines and limits an actor's duty under section 324A. *See, e.g., Homer v. Pabst Brewing Co.,* 806 F.2d 119, 121 (7th Cir. 1986).

■ Where a person neglects to do what is obligated, he has committed a breach of contract. *Ogea v. Loffland Bros. Co., Inc.,* 622 F.2d 186, 189 (5th Cir.1980). It is fundamental contract law that a party that breaches a contract is liable for the damages caused by its failure to satisfy its contractual obligations. *Id.* at 189.

■ The United States Supreme Court has recently held that the principles of legal or proximate causation in maritime tort also apply to harm resulting from a breach of contract. *See Exxon Co. U.S.A.,* 517 U.S. at 839, 116 S.Ct. 1813 ("Although the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well.")

## A. Sanco Group

The Wreck Act provides that:

[I]t shall be the duty of the owner ... of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner ... to do so shall be unlawful; and it shall be the duty of the owner ... to commence the immediate removal of the same, and prosecute such removal diligently ....

33 U.S.C. § 409 (1997).

Thus, under the Wreck Act, Sanco was charged with marking the obstruction to navigation, commencing immediate removal of the obstruction, and maintaining the marker until the obstruction was removed. *See Miss Janel*, 725 F.Supp. at 1566 (citing *Inland Tugs Co. v. Ohio River Co.*, 709 F.2d 1065, 1071 (6th Cir.1983)).

"The duties to mark and maintain the mark are non-delegable, non-imputable duties which cannot be assigned or assumed (to the absolution of the owner from liability) by any third party." *Id.*

■ A vessel owner may hire an agent or third party to search for and mark a wreck or hazard, but the owner remains ultimately responsible. *Id.*, at 1567 (citing *Inland Tugs*, 709 F.2d at 1070).

■ A third party may be held liable for negligently maintaining a marker of a submerged object, but any such liability does not absolve the owner of liability under the Wreck Act. *See Dunaway v. United States*, No. Civ.A. 98–2035, 2000 WL 64291 *4–5 (E.D.La. Jan. 26, 2000) (citing *Inland Tugs*, 709 F.2d at 1071 n. 6); *Humble Oil & Refining Co. v. Tug Crochet*, 422 F.2d 602, 607 (5th Cir.1970) (implicitly recognizing that a third party could be liable for failing to properly mark a wreck by exonerating the United States Coast Guard of such liability); *Miss Janel*, 725 F.Supp. at 1568 (holding a third party who voluntarily assumed responsibility to search liable for not exercising due care in its search); *In the Matter of Texaco, Inc.*, 570 F.Supp. 1272 (E.D.La.1983).

Sanco's duty to monitor and maintain the marker to the OCEAN STAR mat was continuous. The Fifth Circuit explained this duty as follows:

Common sense in regulations tell even landlubbers that floating aids to navigation are liable to be carried away or disabled through natural causes or accidents and are not as reliable as shore-based navigational aids.

*Humble Oil & Refining Co.*, 422 F.2d at 606.

The duty to continuously monitor and maintain an obstruction to navigation is further evidenced by the Sixth Circuit's ruling in *Inland Tugs Co.*, wherein the court held that an owner to an obstruction to navigation was grossly negligent in failing to maintain the mark and to "even once during a five day period visit the wreck scene to determine if the buoy which supposedly marked the wreck was on station ...." *Inland Tugs Co.*, 709 F.2d at 1071. The evidence establishes that the Sanco Group did not properly monitor and maintain the marker on station.

■ It is uncontested that the OCEAN STAR mat was not properly marked at the time of the allision. Thus, Sanco is in violation of federal statutes 33 C.F.R. § 64.11 and 33 U.S.C. § 409, and consequently the Pennsylvania Rule shifts the burden to Sanco to show that its statutory breach could not have caused or contributed to the allision.

The evidence submitted at trial establishes that the Sanco, as well as Saber, who undertook to fulfill Sanco's duties under the Wreck Act, were negligent in failing to have the legs cut off as soon as they learned that Ruiz could not raise the mat. Had the legs been cut off as suggested early on by Jaross, the accident could have been avoided.

Sanco and Saber are also at fault for not fully communicating to PDNO their purpose for installing the purchased buoy. Sanco and Saber did not provide sufficient written instructions about the work or nature of the purchased buoy and its components to PDNO. These measures could have prevented PDNO's failure to install the light or timely report that the light had not been installed. Similarly, Sanco and Saber failed to fully inform Sub Sea about the nature of the obstruction. The court finds that Sub Sea properly inquired about the site the buoys were marking, but that Saber failed to adequately inform Sub Sea about the hazard to navigation. Sub Sea had no reason to inquire further inasmuch as Saber misleadingly informed Sub Sea that the "buoy is in 56 feet of water." The failure to adequately communicate with PDNO and Sub Sea is a proximate cause of the allision.

Sanco and Saber also were negligent for not adequately marking and monitoring the obstruction. After PDNO installed the purchased buoy, neither Sanco nor Saber attempted to independently check the condition and placement of the purchased buoy, and never asked Sub Sea to check on the lighting or condition of the purchased buoy. From January 12, 1996 when PDNO placed the purchased buoy until February 12, 1996 when the MAC TIDE 63 hit the obstruction and sank, neither Sanco, Saber, nor their agents went to the site to check on the purchased buoy. Even though Frank Ruiz had checked lights on various rigs for the Sanco Group during the twenty plus years he worked for them, they did not request him to check on the status of the buoys at the obstruction. They never requested either PDNO or Sub Sea to confirm that the obstruction was properly marked.[6] They cannot overcome the heavy burden of the Pennsylvania Rule. The size of the buoy and the absence of a light on the buoy undoubtedly were contributory causes of the allision. The evidence shows that in the weather and sea conditions on the night of the allision, a larger, lighted buoy could have been observed by vessel traffic. The delegation of placing the buoy on site to PDNO does not relieve the Sanco or Saber from liability.

The court finds no conduct by Rig Ventures that can form the basis for liability in this case.

### B. PDNO

The owner of an obstruction may hire a third-party to assist in marking a hazard, and the failure to fulfil such contractual obligation constitutes negligence. *In the Matter of Texaco, Inc.*, 570 F.Supp. 1272 (E.D.La.1983).

PDNO undertook the duty of Sanco and Saber to mark the wreck and was obligated to exercise this undertaking with reasonable care. PDNO breached this duty by failing to install the light and failing to inform Saber of that fact. PDNO compounded its negligence when it submitted the wreck site report to Saber without advising that the light had not been installed. Even after becoming aware that Saber intended to remove the rented buoy, PDNO did not inform it about the light. Saber chose to refrain from checking on the buoy based on PDNO's representations. PDNO's fault was a proximate cause of the casualty.

Saber never would have hired Sub Sea to remove the rental buoy if it had known PDNO did not install the light. Before contacting Sub Sea, the Sanco interests had received written confirmation from PDNO that it had installed the purchased buoy and relied on those reports before retaining Sub Sea to pick up the rental buoy.

PDNO is not liable for breach of contract because the evidence fails to establish a contractual duty of PDNO to ensure installation of a lighted buoy or a buoy meeting Coast Guard regulations.

---

**6.** They did ask PDNO to check whether the rental buoy was still on site.

■ PDNO argues that it should be exculpated from liability because of the alleged superseding negligence of Sub Sea and Tidewater. The court finds that PDNO's fault was not superseded by the fault of Sub Sea or Tidewater. As found by Judge Vance, it was not highly extraordinary that Sub Sea might remove the rental buoy, or that Capt. Bilich might not consult current charts or Notices to Mariners. *See Tidewater*, 1997 WL 543108 at *6. Sub Sea's removal of the rental buoy and Capt. Bilich's failure to spot the unlit buoy are foreseeable consequences of the situation created by PDNO's negligence. Accordingly, PDNO is not entitled to relief from liability under the doctrine of superseding cause.

### C. Sub Sea

■ Sub Sea is alleged to have violated several federal regulations. 33 C.F.R. § 62.65 provides that a mariner should notify the nearest Coast Guard facility immediately of any observed aids to navigation defects or discrepancies. There is no evidence in the record that Sub Sea's employees were aware that the buoy remaining on site was serving as an aid to navigation or had defects or discrepancies, because they did not know it was marking a hazard or obstruction to navigation. As such, there is no evidence in the record that this statute was violated.

Section 64.16 addresses the obligation of an owner of a wreck, and therefore does not apply to Sub Sea.

Sub Sea did not violate § 66.01–25 which prohibits changing, moving, or discontinuing an aid to navigation without permission from the Coast Guard because the owner of the obstruction hired Sub Sea to remove the rental buoy. Thus, Sub Sea acted with the express authorization from the entity statutorily required to maintain the marking buoy and cannot be deemed to have violated the plain meaning of those terms. Likewise, Sub Sea did not obstruct or interfere with an aid to navigation in violation of § 70.01–1. As found by Judge

Vance in this case, "Sub Sea's performance of its contractual obligations is surely not the type action 33 C.F.R. § 70.01–1 (1997) was designed to outlaw." *Tidewater*, 1997 WL 543108 at *10.

33 C.F.R. § 66.01–45 sets forth penalties for persons who "establish, erect, or maintain any aid to maritime navigation without first obtaining authority to do so from the Coast Guard." Sub Sea took no action which would fall within the ambit of this regulation.

■ As the captain of an inspected lift boat, Capt. McLean was subject to the following regulation:

> Licensed deck officers are required to acquaint themselves with the latest information published by the Coast Guard and the U.S. Navy regarding aids to navigation. Neglect to do so is evidence of neglect of duty. It is desirable that vessels other than motorboats shall have available in the pilot house for convenient reference at all times a file of the applicable Notices to Mariners.

46 C.F.R. § 97.05–1. Thus, Capt. McLean was statutorily obligated to know that a sunken obstruction was at the site when he was removing the lighted buoy. His failure to learn of the presence of the submerged obstruction by consulting current charts and Notices to Mariners was negligent. His negligence was a proximate cause of the allision because he would not have removed the lighted buoy had he known of the obstruction.

Sub Sea's failure to refer to its charts and its ignorance of the presence of the wreck did not supersede the risk of harm caused by Saber's, Sanco's, or PDNO's negligence. A reasonable person would not consider Sub Sea's failure to consult its charts highly extraordinary but foreseeable negligence. *See Tidewater*, 1997 WL 543108 at *6 ("it is not unforeseeable that vessels, like the M/V MAC TIDE 63 might rely on statutorily required buoys to warn them of obstacles in navigable waters.")

The evidence does not support a contractual basis for liability against Sub Sea. *See Tidewater*, 1997 WL 543108 *9–10.

For the reasons discussed in the Factual Findings, the court finds concludes that Saber is not liable to Sub Sea under Article V of the Time Charter, and Sub Sea is not liable to Saber under Article VIII of the Time Charter.

### D. Tidewater

 The law is settled that when a moving vessel strikes a fixed object, there is a presumption that the moving vessel was at fault. *The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943, 949 (1895); *Delta Transload, Inc. v. M/V Navios Commander*, 818 F.2d 445, 449 (5th Cir.1987); *Bunge Corp. v. M/V FURNESS BRIDGE*, 558 F.2d 790, 794 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978). When a mariner knows of an obstruction to navigation he is under a duty to avoid it. *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1470–71 (5th Cir.1991); *Mid–America Transp. Co., Inc. v. Nat'l Marine Serv., Inc.*, 497 F.2d 776, 779 (8th Cir. 1974). This presumption applies to allisions with submerged or hidden objects when the person operating the vessel has actual knowledge of the obstruction. *See id.*, (citing *Delta Transload*, 818 F.2d at 450).

 Captain Bilich's failure to familiarize himself with the obstructions in the area of his voyage and to update his charts constitutes a violation of the statutory regulations governing mariners. *See* 33 C.F.R. § 164.33. 33 C.F.R. § 164.30 provides that no person may operate a vessel without the marine charts and publications required in 33 C.F.R. § 164.33. 33 C.F.R. § 164.33 requires that vessels carry the most recent available and updated Notice to Mariners for the areas that a vessel will transit. In addition, general maritime law and safe navigation require the most up-to-the date charts and local information. *See Higman Towing Co. v. The Dredge Tom James*, 637 F.Supp. 925, 929 (E.D.Tex. 1986) (failure to read Notices to Mariners constitutes negligence and was a proximate cause of collision along with a failure to adequately mark the obstruction). Capt. Bilich's failure to check charts on his vessel to ensure that the most current charts were being used constitutes a violation of 33 C.F.R. § 164.33 and § 164.30. These failures also constitute negligence. *See De Bardeleben Marine Corp. v. U.S.*, 451 F.2d 140, 148–49 (5th Cir.1971) (sailing with an obsolete chart renders a vessel unseaworthy); *In the Matter of TT Boat Corp.*, No. CIV–A 98–494, 1999 WL 223165 *8 (E.D.La. April 14, 1999) (lack of current or updated charts on Tidewater's vessel constitutes negligence).

In addition, a presumption of negligence operates against Tidewater insofar as its master had knowledge based on prior voyages in the area and conversations with another Tidewater Captain of the buoy and/or the submerged obstruction. *See Delta Transload*, 818 F.2d at 450.

Under the Pennsylvania Rule, Tidewater has the burden of proof to show that its violation could not have been a cause of the accident. Tidewater has not shown that its breach of the regulations "could not have been" one of the causes of the accident. Had the charts been updated and available, the obstruction would have been identified on the chart, and the accident could have been averted. The failure to update and consult navigational charts was a proximate cause of the allision. Even though other party's negligence also played a role, their acts of negligence do not negate the role that Capt. Bilich's failure to make himself aware of the obstruction played in causing the accident.

The evidence established that it is not highly extraordinary for a vessel's captain to fail to check charts; therefore, Tidewater's fault is not a superseding cause of the allision.

## E. Allocation of Fault

Based on the foregoing facts, the court finds that the apportionment of fault for the allision and resulting damages is: Sanco 16%; Saber 16%; Rig Ventures 0%; PDNO 28%; Sub Sea 15%; and Tidewater 25%.

## III. DAMAGES

### A. Salvage

After the allision, Tidewater and its underwriters appointed Jules Schubert, an expert marine surveyor, to manage the salvage efforts. The MAC TIDE 63 sank in 50–60 feet of water and had a large hole in its side. Schubert decided that a plate needed to be fixed to the hull to keep the vessel from sinking during the salvage. Schubert solicited bids from four potential salvers. He accepted a bid from American Eagle Marine, Inc. (American Eagle), notwithstanding his doubts about their capacity to do the job, because they asked him to be included, and he did not want to risk offending Tidewater's relationship with them.

The bids ranged from a low of $366,000 by American Eagle to a high of $980,000 by Smit (Americas), Inc. Bisso Marine Co., Inc. (Bisso) had the second lowest bid at $875,000, more than $500,000 more than the American Eagle bid. Based on Schubert's recommendations, Tidewater selected Bisso to perform the work.

Defendants argue that Tidewater failed to mitigate its damages by not choosing American Eagle, the low bidder. They argue that Tidewater should have met with American Eagle to attempt to cure some the concerns about its bid proposal.

A person claiming damages for injury to property has a duty to take reasonable efforts to mitigate the damages, and recovery will be reduced to the extent that damages are enhanced by unreasonable failure to mitigate. *See e.g., Marathon Pipe Line Co. v. M/V SEA LEVEL II*, 806 F.2d 585 (5th Cir.1986). The de-fendants have the burden to prove the damages that the plaintiff could have miti-gated. *See Bosnor, S.A. v. Tug L.A. Bar-rios*, 796 F.2d 776 (5th Cir.1986); *Marine Office of America Corp. v. M/V VULCAN*, 891 F.Supp. 278 (E.D.La.1995).

Schubert never investigated American Eagle's bid because he did not think they were capable of performing the job. The fact that they did not own their own equipment meant possible delays and scheduling problems. *See e.g., Elgin, J. & E. Ry. Co. v. American Commercial Line, Inc.*, 317 F.Supp. 175, 176 (N.D.Ill.1970) (accepting a lower bid would cause a delay that would, in turn, jeopardize the safety of a bridge). He also questioned their financial stability, and thought their proposed method for raising the vessel was too risky. American Eagle bid to use a 1/8″ plate to patch the hole in the hull as opposed to a 3/8″ plate bid by Bisso. In addition, Schubert preferred the method proposed by Bisso for attaching the plate. American Eagle's plan to pump air into the vessel's compartments concerned Schubert because pumping air can damage a vessel. He also believed that the 500 ton derrick crane proposed by American Eagle was insufficient. In fact, the actual lift capacity it took to raise the vessel was 970 tons.

The defendants' marine surveying expert, Norman Dufour, testified on the issue of mitigation. He did not question the reasonableness of Bisso's bid or totally discount the concerns that Schubert had, but simply pointed out that had Tidewater asked American Eagle to alter its bid to incorporate the methods and equipment Schubert felt were preferable, the amended bid might have been lower than Bisso's bid. Dufour admitted that price alone is not the determining factor in selecting a salvor, and that the lowest bid is not necessarily the one that should be selected.

The evidence does not show that Bisso's bid was unreasonable or inflated, and the evidence supports Schubert's concerns about American Eagle's bid. There is no

evidence that American Eagle would have changed its proposal to suit Tidewater, or what American Eagle would charge to make those changes. Therefore, the court finds that the defendants have failed to carry their burden to prove that Tidewater failed to mitigate its damages by not selecting the lowest bidder.

### B. Constructive Total Loss

■ A vessel is considered a constructive total loss when the cost of salvage and repairs is greater than the fair market value immediately prior to the casualty. *Ryan Walsh Stevedoring Co., Inc. v. James Marine Serv., Inc.,* 792 F.2d 489, 491 (5th Cir.1986); *Self Towing, Inc. v. Brown Marine Serv., Inc.,* 837 F.2d 1501, 1506 (11th Cir.1988).

■ It is the plaintiff's burden to prove damages. A prima facie case is established with proof of repair costs. *O'Brien Bros. v. The Helen B. Moran,* 160 F.2d 502, 505 (2nd Cir.1947). If the defendant then provides evidence suggesting that the total value of the vessel is less than the cost of repairs, the plaintiff must rebut that evidence with proof of a higher market value, or else recovery may be limited. *Id.*

■ In determining whether a vessel is a constructive total loss, the insured value is not controlling as to fair market value prior to the allision. *See Self Towing,* 837 F.2d at 1506. As a general rule, market value should be established by evidence of contemporaneous sales of like vessels. *Standard Oil Co. v. Southern Pac. Co.,* 268 U.S. 146, 155–56, 45 S.Ct. 465, 69 L.Ed. 890 (1925). The court may establish market value by other means as long as its judgment is reasonable. "The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." *Id.* at 156, 45 S.Ct. 465; *see also Oliver J. Olson & Co. v. American S.S. Marine Leopard,* 356 F.2d 728, 733 n. 1 (9th Cir.1966).

It is undisputed that until about a week prior to the salvage operations, everyone involved considered the vessel a constructive total loss. But, it also is undisputed that the parties involved were not able to accurately estimate the repair costs until after the salvage.

The actual cost of salvage and repairs to the MAC TIDE was $3,309,500.28. Tidewater spent an additional $61,687.74 on marking and locating the wreck and pollution control, for a total expenditure related to the casualty of $3,371,188.02.

The evidence of the fair market value consisted of testimony from Tidewater's Vice–President of Marine Operations, Domestic Tug Division who, based on his experience, placed the fair market value at the time of the sinking somewhere between 4 and 4.5 million dollars. The defendant's own expert witness, Norm Dufour, reviewed sales of comparable vessels and found the fair market value of the MAC TIDE 63 at the time of the allision to be $4,050,000.

The parties jointly submitted stipulated testimony of John Wiggins, an expert marine surveyor, who was retained by Tidewater within a few days after the sinking to make some calculations to determine whether the MAC TIDE 63 was a constructive total loss. In Wiggins opinion, if the cost of repairs plus salvage was within 85–100% of the insured value, then the vessel was a constructive total loss.

The MAC TIDE 63 was required by contracts with third parties to insure the vessel for its "fair value." Pursuant to these contracts, the MAC TIDE 63 was insured for a value of 3.3 million dollars at the time of the sinking. Using this insured value as the fair market value of the vessel, Wiggins calculated that the repairs and salvage expenses would be as much as 4.8 million dollars and accordingly, reported to Tidewater that the vessel was a constructive total loss.

Thus, it is the defendant's position that the vessel was a constructive loss because

immediately prior to the casualty the fair market value of the MAC TIDE 63 was 3.3 million dollars, a figure less than the amount expended on salvage and repair.

The defendants' position regarding fair market value is based solely on the insured value of the vessel pursuant to contracts with third parties. As stated, the law does not accept insured value as controlling on this issue. In addition, the insured value in this case is not reliable evidence of fair market value immediately prior to the allision. The evidence does not show how the figure of 3.3 million dollars was determined or when it was determined. To accept the defendants' argument that the insured value of 3.3 million dollars is the fair market value, the court would have to ignore the defendants' own expert testimony that the fair market value at the time of the allision was over 4 million dollars.

■ The court finds that the cost of repairs to the MAC TIDE 63 was at least $600,000 less than its fair market value immediately prior to the allision. Thus, the MAC TIDE 63 was not a constructive total loss, and Tidewater is not precluded from recovering lost profits. *Ryan Walsh Stevedoring*, 792 F.2d at 491; *Self Towing*, 651 F.Supp. at 192.

## C. Repairs

A vessel owner is entitled to recover the cost of reasonable and necessary repairs to its vessel from the vessel owner at fault in a collision. *Marathon Pipe Line Co. v. Drilling Rig ROWAN/ODESSA*, 761 F.2d 229, 233 (5th Cir.1985).

It is undisputed that Tidewater spent a total of 3,309,500.28 on repairs related to the hull claim. Tidewater spent an additional $61,687,74 on marking and locating the wreck and pollution control for a total expenditure related to the casualty of $3,371,188.02.

There is no evidence that the amount spent on these repairs was unreasonable.

## D. Lost Profits/Loss of Use

Tidewater seeks damages for the profits it lost while the MAC TIDE 63 was detained for repairs. The burden of establishing that profits were lost is upon the shipowner. *Skou v. United States*, 478 F.2d 343, 345 (5th Cir.1973).

Loss of profits "need not be proven with an exact degree of specificity." *Marine Transport Lines, Inc. v. M/V TAKO INVADER*, 37 F.3d 1138, (5th Cir.1994) (quoting *Mitsui O.S.K. Lines, K.K. v. Horton & Horton, Inc.*, 480 F.2d 1104, 1106 (5th Cir.1973).) The loss must be proved with reasonable certainty. *See Delta Marine Drilling Co. v. M/V BAROID RANGER*, 454 F.2d 128, 130 (5th Cir.1972). Establishing a loss to a "reasonable certainty" usually involves a showing that the vessel 'has been engaged, or was capable of being engaged in a profitable commerce ....'" *Delta S.S. Lines v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1001 (5th Cir.1984) (quoting *The Conqueror*, 166 U.S. 110, 17 S.Ct. 510, 519, 41 L.Ed. 937 (1897)).

■ Calculation of loss of profits involves consideration of the rate of profit per day, the reasonable period of detention, and utilization. *Marine Transport Lines*, 37 F.3d at 1140–41. The proper method of determining utilization is to seek a fair average based on historical usage. *Delta S.S.*, 747 F.2d at 1001.

The MAC TIDE 63 was out of service due to the allision and repairs from February 13, 1996 through April 14, 1997—a 14-month period. It was stipulated by all parties that the repairs reasonably could have been performed in a period of 342 days, or a little over 11 months. Therefore, the only two variables in dispute were the vessel's average daily profit and the vessel's probable utilization rate.

In this case there is no doubt that the MAC TIDE 63 was active and that there was a ready market for its services. There was uncontradicted trial testimony from Tidewater that the service industry

for which the MAC TIDE 63 was acquired, marine construction, was very active during the period of repair.

The utilization factor is the estimated percentage of time the vessel would have worked during the period the vessel was out of service. The number of days that the vessel was out of service must be adjusted by the vessel's historical utilization rate to arrive at the number of days that the vessel did not earn revenue as a result of the accident. The exact number of days the MAC TIDE 63 would have worked does not have to be proven with precision. *See e.g., Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 414 (5th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 448, 74 L.Ed.2d 603 (1982) (where the court used a percentage of utilization).

The remaining critical factor in determining lost profits is the profit per day for the use of the vessel. Based upon counsel's stipulation that a reasonable period for the MAC TIDE 63 to have been out of service was 342 days, the court finds that the profit per day for the MAC TIDE 63 was $4,229.00.[7]

Tidewater owned four vessels comparable to the MAC TIDE 63, which were engaged in a similar trade. While the MAC TIDE 63 was being repaired, the four comparable vessels worked 70.3% of the time.

Tidewater has assumed that had the MAC TIDE 63 been in service, it would have worked as much as the four comparable vessels. Tidewater unreasonably failed to include in its loss of use analysis the historical data of the use of the vessels, the fact that the other four vessels worked harder during the period that the MAC TIDE 63 was out of service, and the fact that Tidewater earned revenue from third-party vessels used to substitute for the MAC TIDE 63.

The court finds that it is reasonable to calculate the utilization rate by looking at the historical utilization of the five comparable vessels during the three years prior to the sinking and compare the historical usage to the usage of the four comparable vessels after the sinking.[8]

The utilization rates averaged among the five vessels are 59% in 1994, 38% in 1995, and 55% in 1996. The three-year average among all five vessels is 51%.

The evidence shows that there was an 8% increase in utilization rates from 1996 to 1997 due to market demand. Therefore, it is reasonable to conclude that had all five vessels been serviceable in 1997, they would have averaged a 59% utilization rate. From that figure, the extent to which the four comparable vessels were used to mitigate the MAC TIDE 63's damages must be subtracted. There is no loss of use to the extent that other vessels in the fleet are able to perform the work of the damaged vessel. *Brooklyn Eastern Dist. Terminal v. United States*, 287 U.S. 170, 176, 53 S.Ct. 103, 105, 77 L.Ed. 240 (1932).

The evidence shows that the four comparable vessels actually worked at an average utilization rate of 70% in 1997, which is 19% more than the estimated average utilization rate of 59%. The 19% increase in utilization is attributable to mitigation efforts. Taking into account the amount by which the comparable vessels mitigated the MAC TIDE 63's damages results in a 48% utilization rate. Multiplying that utilization rate by the days available and the day rate of $4,229 results in lost profits of $694,232.64.

In some instances when Tidewater did not have a tug available to work on a job, it would outsource or broker a tug from another company. A percentage of the amount charged to the client for the out-

---

7. This figure is lower than Tidewater's figure of $4,466.00, since the latter figure is based upon financial data that was excluded pursuant to the stipulated reasonable repair period.

8. There is no evidence in the record to establish what the utilization rates were after the MAC TIDE 63 was back in service.

sourced tug would be kept by Tidewater as a brokerage fee. The brokerage fee was usually 5% or less. Tidewater received $45,294 in brokerage fees for third-party vessels brokered during the period the MAC TIDE 63 was out of service. This amount must be deducted from Tidewater's loss of profits of $694,232.64, which leaves $648,938.64. in lost profits.

### E. Enhancement of the MAC TIDE 63

"[A] party suffering injury is entitled to recover only that which is necessary to restore his damaged property to the same condition as existed immediately prior to the delict." *City of New Orleans v. American Commercial Lines, Inc.*, 662 F.2d 1121, 1124 (5th Cir.1981) (citing *Petition of M/V ELAINE JONES*, 480 F.2d 11 (5th Cir.1973)). This rule is designed to avoid giving the injured person a windfall by furnishing something entirely new "for that which was old and depreciated and would in the normal course of things have to be replaced in any event." *Id.* (citing *State Highway Comm'n v. Tug Go-Getter*, 468 F.2d 1270, 1273 (9th Cir.1972)); *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir.1976). Thus, the court must determine whether the repairs added to the vessel's value and if so, make an appropriate reduction from the cost of repairs. *See In the Matter of Crounse Corp.*, 956 F.Supp. 1377, 1381-82 (W.D.Tenn.1996); *Pillsbury Co. v. Midland Enter., Inc.*, 715 F.Supp. 738, 764 (E.D.La.1989), *aff'd*, 904 F.2d 317 (5th Cir. 1990).

The MAC TIDE 63 was built in 1983. Tidewater purchased the vessel in 1993 for $2,000,000. Tidewater made repairs to the vessel and thereafter placed it in its domestic fleet. Tidewater gave the vessel an estimated useful life of 25 years from the date it was built.

The parties' experts differed on whether the life of the vessel was extended by virtue of the repairs. Setting aside the debate as to whether the repair of particular parts of the vessel extended its life, (which depended on speculation about the pre-accident condition of the parts at issue), the court finds the evidence that the vessel was not enhanced by the repairs unpersuasive.

The evidence clearly establishes that the vessel was enhanced by the repairs, but trying to establish the amount of the enhancement is not so easily determined. The defendants' expert found three widely varying figures using three valid but different methods. Under the cost approach, he found $1.7 million in enhancement, which he reduced by 50% due to the vessel's age at the time of the accident. Under the market approach, he found an increase in value in the amount of $738,000. Under the income approach, he found an extra five years of life due to the repairs' enhancement which would amount to additional income in the amount of $1,250,000. Finally, he averaged the three methods to reach a total enhancement figure of $940,800.

The court finds that the benefit of the repairs to the vessel is reasonably limited to the increase in the vessel's market value ($738,000). This method does not rely on speculation about the life enhancing value of particular repairs. It also lacks problems with assumptions made by the defense expert under the other two appraisal methods. The market figure also takes into consideration the improved market conditions after the accident.

Tidewater should be allowed to recover only the amount necessary to restore the MAC TIDE 63 to its condition immediately prior to the accident. Therefore, a reduction in the cost of repairs in the amount of $738,000 for the increase in market value to the MAC TIDE 63 is appropriate.

### F. Prejudgment Interest

Pre-judgment interest is a general, but not automatic rule, in maritime cases. *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 115 S.Ct. 2091, 2096, 132 L.Ed.2d 148 (1995). The defendants argue that it should not be awarded in this case because Tidewater's valuation

of damages was unreasonably high and failed to account for certain necessary deductions, citing *E.I. DuPont de Nemours & Co. v. Robin Hood Shifting & Fleeting Serv., Inc.*, 899 F.2d 377, 383 (5th Cir.1990) and *Patterson Terminals, Inc. v. S.S. Johannes Frans*, 209 F.Supp. 705, 711 (E.D.Pa.1962).

As recently noted by the Fifth Circuit in *Probo II London v. Isla Santay M/V*, 92 F.3d 361, 363–64 (5th Cir.1996), neither the existence of a good faith dispute as to liability nor the existence of mutual fault constitutes "peculiar" circumstances as to warrant denial of prejudgment interest from the date of loss.

Accordingly, the court finds that an award of prejudgment interest is appropriate in this case.

### F. Conclusion

The court finds that Tidewater's total damages, prior to reduction for its percentage of comparative fault or interest adjustment, amounts to $3,282,126.50. This figure is based on $3,371,187.90 for salvage, repair, and extraordinary expenses, less $738,000 for enhancement, plus lost profits in the amount of $648,938.64.

Accordingly,

IT IS ORDERED that the amount of damages sustained by Tidewater as a result of the allision of the M/V MAC TIDE 63 is in the amount of $3,282,126.50, plus prejudgment interest, which shall be reduced by 25% based on the fault apportioned to Tidewater, and with the remaining damages due Tidewater assessed 16% against Sanco; 16% against Saber; 28% against PDNO; and 15% against Sub Sea.